**Coramae Ella GARY, Appellant,**

v.

**James Edward LONG, et al., Appellees.**

No. 94–7012.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1995.

Decided July 28, 1995.

Charles W. Scarborough, Washington, DC, argued the cause and filed the briefs, for appellant.

Woodley B. Osborne, Washington, DC, argued the cause and filed the brief, for appellee Long.

Gerard J. Stief, Associate Gen. Counsel, Washington Metropolitan Area Transit Authority ("WMATA"), with whom Robert L. Polk, Gen. Counsel, and Robert J. Kniaz, Deputy Gen. Counsel, WMATA, were on the brief, argued the cause, Washington, DC, for appellee WMATA.

Karen M. Moran, Washington, DC, U.S. Equal Employment Opportunity Com'n, argued the cause and filed the brief, for amicus curiae.

Before BUCKLEY, WILLIAMS, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Coramae Ella Gary alleges that her employer, the Washington Metropolitan Area Transit Authority ("WMATA"), and one of its supervisory employees, James Edward Long, violated Title VII of the Civil Rights Act of 1964 and committed various common law torts by subjecting her to sexual harassment. The district court granted appellees' motions for summary judgment, dismissing the Title VII claims against WMATA and refusing to exercise jurisdiction over Gary's common law tort claims. A magistrate judge then dismissed Gary's Title VII claim against Long. We affirm the dismissal of the Title VII claims and remand the others.

## I. BACKGROUND

■ In reviewing a district court's decision on a motion for summary judgment, we must consider the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Accordingly, the following account of Long's conduct is based on the allegations in Gary's complaint and deposition.

Coramae Gary began working at WMATA in May 1983 and was promoted to the position of stock clerk in 1987. Beginning in April 1988, Long, her second-level supervisor, began a pattern of sexual harassment. Long first attempted to entice Gary into having sexual relations with him through promises that he could make her job easier. After this carrot proved unsuccessful, Long tried using a stick. He repeatedly threatened Gary with adverse employment consequences, including termination of employ-

ment, if she did not submit to his advances. Long made crude references to her body, regularly expressed his desire to have sex with her, threatened to "get" her for refusing to meet with him, and indicated that he would have her fired if she told anybody of his sexual advances. Gary unfailingly rejected Long's overtures and made him aware that they were unwelcome.

Long's harassment was not limited to verbal abuse. According to Gary, in May or June of 1989, under the pretext of conducting an inspection of a WMATA construction site, Long drove her to a secluded storage facility and, while driving, fondled her breasts and rubbed his hands between her legs. Upon their arrival at the storage facility, he raped her. Thereafter, Long threatened reprisals if Gary told anyone what had happened. Gary was subsequently in an automobile accident and did not return to work until January 1990, whereupon Long resumed his verbal harassment.

On February 14, 1990, Gary reported Long's sexual harassment to a WMATA counselor and later filed a formal grievance with WMATA. Three months later, Gary filed a charge of sexual harassment with the Equal Employment Opportunity Commission. After receiving a "right to sue" letter from the agency, Gary filed this action against Long and WMATA in the U.S. District Court for the District of Columbia. In her complaint, she alleged that Long and WMATA had discriminated against her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1) (1988), and that Long and WMATA had committed various common law torts, including battery, invasion of privacy, and intentional infliction of emotional distress. Gary's Title VII claim was premised on the "hostile environment" theory of sexual harassment: She alleged that Long's "actions ... created a sexually hostile atmosphere detrimental to [Gary's] emotional and physical health...." Complaint ¶ 13. Gary also argues that her Title VII claim effectively asserts a claim of *"quid pro quo"* sexual harassment. Brief for Appellant at 20–23.

In response to Gary's allegations, WMATA stated that it had not received notice of the alleged sexual harassment until February 28, 1990. On its receipt, WMATA conducted an immediate, detailed investigation of the charges and concluded that there was no corroborating evidence to support them. WMATA also reassigned Gary to another facility where she could avoid further contact with Long.

WMATA noted that, at all relevant times, it had an "active and firm policy against sexual harassment." For example, it sponsored numerous seminars on sexual harassment, issued notices to all employees that such conduct would not be tolerated at any level, published a Civil Rights Policy Statement, prominently displayed the names, photographs, and telephone numbers of its Equal Employment Opportunity Counselors, and established, publicized, and enforced its discrimination complaint procedures. These procedures provided employees with the right to complain informally to EEO Counselors and formally to WMATA's Office of Civil Rights, the right to representation, and the right to an internal review of any unfavorable determinations.

On December 2, 1992, the district court dismissed Gary's Title VII claim against WMATA. In an unpublished opinion, the court held that

> [a]n employer is not liable for the hostile environment created by a supervisor when the employer (1) has done nothing to indicate that it sanctions the type of conduct for which the offending supervisor is accused, (2) has a strong policy against sexual harassment and has made available to employees an avenue of complaint which steers clear of the offending supervisor, and (3) takes prompt remedial measures as soon as it is alerted of the situation.

*Gary v. WMATA,* Civ. A. No. 90–3076, 1992 WL 714990 (D.D.C. Dec. 2, 1992) ("Memorandum Opinion and Order"). Without explanation, the court also declined to exercise jurisdiction over Gary's common law tort claims.

By consent of the parties, the district court referred the Title VII claim against Long to a magistrate judge. The magistrate judge dismissed the claim, holding that individual supervisors cannot be held personally liable

for monetary damages under Title VII. Gary appeals these decisions.

## II. DISCUSSION

### A. Gary's Title VII Claim Against WMATA

Title VII makes it unlawful for an employer

> (1) ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e–2(a)(1) (1988). The Supreme Court has held that

> this language is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment.

*Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). Courts have found sexual harassment to be discriminatory in either of two circumstances: the grant or denial of an economic *quid pro quo* in exchange for sexual favors, *see, e.g., Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 782–83 (1st Cir.1990); *Highlander v. K.F.C. Nat'l Management Co.,* 805 F.2d 644, 648 (6th Cir.1986), or discrimination that has created a hostile or abusive work environment. *See, e.g., Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 575 (10th Cir.1990). In the latter context, the Supreme Court has noted that

> [w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.

*Harris,* —— U.S. at ——, 114 S.Ct. at 370 (internal citations and quotation marks omitted).

■ Because Title VII only prohibits an "employer" from discriminating on the basis of sex, the question arises as to when courts should impute to the employer the sexual harassment of one employee by another. The statute defines "employer" to include "any agent of" an employer. 42 U.S.C. § 2000e(b) (1988). Although, in *Meritor,* the Supreme Court declined to issue a definitive rule on employer liability for sexual harassment of one employee by another, the Court did offer the following guidance:

> *Congress wanted courts to look to agency principles for guidance in this area.* While such common-law principles may not be transferable in all their particulars to Title VII, Congress' decision to define "employer" to include any "agent" of an employer surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. *See generally Restatement (Second) of Agency* §§ 219–237 (1958). For the same reason, absence of notice to an employer does not necessarily insulate that employer from liability.

*Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408 (internal citations omitted) (emphasis added). Accordingly, in determining whether an employer may be held liable, under Title VII, for acts of sexual harassment, we will apply the common law principles of agency, with particular reliance on the Restatement (Second) of Agency ("Restatement").

#### 1. Quid Pro Quo *Sexual Harassment*

■ As the name suggests,

> [t]he gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual black-mail and that adverse consequences follow from the employee's refusal.

*Carrero v. New York City Hous. Authority,* 890 F.2d 569, 579 (2d Cir.1989); *see also Meritor,* 477 U.S. at 76, 106 S.Ct. at 2410 (Marshall, J., concurring in judgment) ("[E]very Court of Appeals that has considered the

issue has held that sexual harassment by supervisory personnel is automatically imputed to the employer when the harassment results in tangible detriment to the subordinate employee."); *Chamberlin,* 915 F.2d at 783 (*quid pro quo* harassment exists where victim's response to unwelcome sexual advances affects "tangible aspects of her compensation, terms, conditions, or privileges of employment") (ellipses omitted); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1414 (10th Cir.1987) (same).

Although not explicitly alleged in her complaint, Gary asserts that Long's conduct gave rise to a Title VII claim under a *quid pro quo* theory of sexual harassment. She argues that "[w]hen, as in this case, the conduct creating a hostile work environment consists of work-related threats and promises by a supervisor with actual or apparent authority to make good on those threats and promises, the distinction between the *quid pro quo* and hostile work environment theories makes no practical difference." Brief for Appellant at 23.

WMATA counters that Long's conduct cannot properly be characterized as *quid pro quo* harassment because he lacked the authority to fire or suspend Gary. WMATA also asserts that because, in her complaint, Gary limited her sexual harassment claim to a hostile work environment theory, she cannot raise a *quid pro quo* theory for the first time on appeal. We need not address these defenses however, because even assuming that a *quid pro quo* theory is properly before this court, we agree that there can be no such harassment in this case.

 Under the circumstances alleged here, it takes more than saber rattling alone to impose *quid pro quo* liability on an employer; the supervisor must have wielded the authority entrusted to him to subject the victim to adverse job consequences as a result of her refusal to submit to unwelcome sexual advances. *See Sauers v. Salt Lake County,* 1 F.3d 1122, 1127 (10th Cir.1993) ("If the plaintiff can show that she suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing of why the employer should be responsible for the supervi-

sor's conduct.") (quoting *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992); *Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178, 186 (6th Cir.1992) ("[T]he employee's refusal to submit to the supervisor's sexual demands [must have] resulted in a tangible job detriment.") (quoting *Highlander,* 805 F.2d at 648); *Hicks,* 833 F.2d at 1414 (*quid pro quo* sexual harassment exists when adverse job consequences result from employee's refusal to submit to sexual advances); *Highlander,* 805 F.2d at 649 (no cause of action for *quid pro quo* sexual harassment where "the record [is] totally devoid of any evidence tending to demonstrate that plaintiff was denied a job benefit or suffered a job detriment as a result of her failure to engage in the activity suggested by [defendant]"); *but see Nichols v. Frank,* 42 F.3d 503, 513 (9th Cir.1994) ("[A] supervisor's intertwining of a request for the performance of sexual favors with a discussion of actual or potential job benefits or detriments in a single conversation constitutes quid pro quo sexual harassment."). To hold otherwise would be to impose liability on the employer without evidence that the supervisor has acted as its agent. Although Gary alleged that Long repeatedly threatened her with adverse job consequences if she did not submit to his sexual advances, those threats were not carried out. Accordingly, we hold that Gary has failed to make out a claim of *quid pro quo* sexual harassment.

### 2. Hostile Work Environment Sexual Harassment

 Whereas a supervisor's mere threat or promise of job-related harm or benefits in exchange for sexual favors does not constitute *quid pro quo* harassment, either may create or contribute to a hostile work environment. Such conduct will be actionable if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (internal brackets and quotation marks omitted). As the Supreme Court noted in *Harris,*

Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their ... gender ... offends Title VII's broad rule of workplace equality.

*Harris,* —— U.S. at ——––——, 114 S.Ct. at 370–71.

■ There is no doubt that Long's alleged conduct was sufficiently severe and pervasive to create a hostile work environment. If proven to be true, Long's repeated verbal and physical harassment of Gary, culminating in a rape, is "not only pervasive harassment but also criminal conduct of the most serious nature" that is "plainly sufficient to state a claim for 'hostile environment' sexual harassment." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06.

■ The question remains, however, whether WMATA may be held liable for the appalling conduct attributed to Long. WMATA argues that in order to hold an employer liable for a hostile work environment, the plaintiff must demonstrate that the employer knew or should have known of the alleged harassment and failed to take remedial action. Gary concedes that the "knew or should have known" standard is appropriate in certain circumstances, but argues that where a supervisor invokes his power as a supervisor to create a hostile work environment, employer liability is appropriate even absent the employer's actual or imputed knowledge of the harassment.

We resolve the question of WMATA's liability for Long's conduct by applying common law principles of agency. As a general rule, "[a] master is not subject to liability for the torts of his servants acting outside the scope of their employment...." Restatement § 219(2). In certain circumstances, however, a master may be held liable for the servant's conduct outside the scope of his employment. *See* Restatement §§ 219(2)(a)–(d). The exception to the rule on which Gary relies is described in section 219(2)(d). It provides that the master may be held liable if

> the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.*

*Id.* § 219(2)(d) (emphasis added). Gary argues that WMATA falls within this exception to the general rule because Long was aided by his employer-delegated authority in carrying out the harassment.

In a sense, a supervisor is always "aided in accomplishing the tort by the existence of the agency" because his responsibilities provide proximity to, and regular contact with, the victim. As Judge MacKinnon noted some years ago, however, such a reading of section 219(2)(d) "argue[s] too much." *Barnes v. Costle,* 561 F.2d 983, 996 (D.C.Cir.1977) (MacKinnon, J., concurring). The commentary to the Restatement suggests that this exception embraces a narrower concept that holds the employer liable only if the tort was "accomplished by an instrumentality, or through conduct associated with the agency status." *Id.* (citing Restatement § 219 cmt. e). Thus a telegraph company may be held liable for a tort committed by a telegraph operator who sends a false telegraph message, as may the undisclosed principal of a store whose manager cheats a customer. *Id.* In such cases, "[l]iability is based upon the fact that the agent's position facilitates the consummation of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Restatement § 261 cmt. a; *see also id.* § 219 cmt. e (citing § 261 in discussion of § 219(2)(d)).

Gary, however, cannot avail herself of the exception described in section 219(2)(d) for one overriding reason. Unlike the individual who received the false telegram or who was cheated by the store manager, she could not have believed (and nor does she claim) that

Long was acting within the color of his authority. It is a general principle of agency law that

> [i]f a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability.

Restatement § 166 cmt. a. As the Third Circuit noted in *Bouton v. BMW of N. Am., Inc.,* 29 F.3d 103 (3d Cir.1994),

> [o]ur agency precedent requires the belief in the agent's apparent authority to be reasonable before the principal will be bound. This theory reconciles the exonerating effect of a remedial policy, which appears to stem from the negligence principles of § 219(2)(b) [ ("the master was negligent or reckless") ], with the apparent authority theory of § 219(2)(d). It also indicates that the reasonableness of the employee's perception of the combined message from the harasser and the employer is important.

*Id.* at 109 (internal citations omitted).

■ Based on the above, we conclude that an employer may not be held liable for a supervisor's hostile work environment harassment if the employer is able to establish that it had adopted policies and implemented measures such that the victimized employee either knew or should have known that the employer did not tolerate such conduct and that she could report it to the employer without fear of adverse consequences. *Cf. Meritor,* 477 U.S. at 72–73, 106 S.Ct. at 2408 (employer's nondiscrimination policy not dispositive because it failed to address sexual harassment and grievance procedure that required complaints first to be lodged with supervisor who, in that case, was the alleged harasser). While a supervisor might purport to act or speak on behalf of the employer, there can be no liability if the victim could not reasonably rely on the supervisor's representations.

Significantly, Gary does not dispute that WMATA had an active policy against sexual harassment, conceding at oral argument that there is "no challenge to the adequacy of WMATA's procedures in terms of providing avenues for relief for sexual harassment" and that there is no claim that these procedures were not known by the employees. In light of that concession, we find that Gary could not have reasonably believed that Long had the authority, apparent or otherwise, to sexually harass her. Therefore, we hold that WMATA is not liable under section 219(2)(d) for Long's alleged sexual harassment.

We do not suggest that an employer must be found liable under Title VII if it has failed to adopt such measures; a determination of liability will always require the application of the law of agency to the particular facts of the case. Rather, we hold that when, as here, an employer has taken energetic measures to discourage sexual harassment in the workplace and has established, advertised, and enforced effective procedures to deal with it when it does occur, it must be absolved of Title VII liability under a hostile work environment theory of sexual harassment. That defense depends, of course, on the ability of the employer to establish that its employees could not reasonably have failed to know of those measures and that its grievance procedures were clearly "calculated to encourage victims of harassment to come forward." *Id.* at 73, 106 S.Ct. at 2408.

In this case WMATA had pursued an active and firm policy against sexual harassment throughout the period of Gary's alleged mistreatment. WMATA had sponsored seminars on the subject, distributed staff notices to all employees informing them that sexual harassment would not be tolerated, publicized its Civil Rights policy statement, and made available to all employees the names and telephone numbers of the EEO Counselors to whom they could report acts of discrimination.

WMATA also had a detailed grievance procedure for the formal and informal internal processing and review of discrimination complaints. As a result of Gary's complaint, for example, a WMATA attorney met with Gary's attorney, interviewed all persons concerned; and, although he determined that there was no corroborating evidence to support her claim, WMATA's General Counsel

granted Gary's request to be transferred to another facility to avoid contact with Long. We find such a detailed and thorough grievance procedure to be "calculated to encourage victims of harassment to come forward." *Meritor,* 477 U.S. at 73, 106 S.Ct. at 2408.

## B. Gary's Title VII Claims Against Long

As noted earlier, Gary asserts that Long is directly liable under Title VII for his acts of sexual harassment. In doing so, she relies on Title VII's definition of "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees ... *and any agent of such a person...."* 42 U.S.C. § 2000e(b) (emphasis added). Gary argues that the "plain and unambiguous language" of section 2000e(b) can only mean that Long, as an "agent" of WMATA, is an "employer" liable under section 2000e–2(a)(1) for discriminating against her on the basis of her sex.

■■■ While a construction of the statute to impose individual liability on an agent is facially plausible, we agree with the Ninth Circuit that "[t]he obvious purpose of this agent provision was to incorporate respondeat superior liability into the statute." *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587 (9th Cir.1993) (brackets and internal quotation marks omitted). Thus, while a supervisory employee may be joined as a party defendant in a Title VII action, that employee must be viewed as being sued in his capacity as the agent of the employer, who is alone liable for a violation of Title VII. *See Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991) (holding that "relief granted under Title VII is against the *employer,* not individual employees whose actions constituted a violation of [Title VII]" (emphasis in original)).

■■■ Considering the evidence in the light most favorable to Gary, we find that Long qualifies as an "employer" under Title VII because he served in a supervisory position. Because Long cannot be held liable in his personal capacity, however, Gary's claim against him essentially merges with her claim against WMATA. *See Sauers,* 1 F.3d at 1125 (claim against supervisor "is a claim against Salt Lake County itself"); *Busby,*

931 F.2d at 772. Accordingly, we conclude that the magistrate judge did not err in dismissing Gary's Title VII claim against Long.

## C. Jurisdiction over the Common Law Tort Claims

In addition to her Title VII claims, Gary alleges that WMATA and Long were liable for several common law torts, including battery, invasion of privacy, and intentional infliction of emotional distress. The district court declared that it would not exercise *pendent* jurisdiction over those claims, but did not explain why. Memorandum Opinion and Order at 2 (emphasis added).

■■■ As an initial matter, we hold that the district court had original jurisdiction over Gary's common law tort claims against WMATA. Under District of Columbia law, "[t]he United States District Courts shall have original jurisdiction, concurrent with the Courts of Maryland and Virginia, of all actions brought by or against [WMATA]...." D.C.Code Ann. § 1–2431(81) (1981). WMATA acknowledges that, "at least insofar as WMATA was concerned, both the Title VII and common law [tort] claims were properly before the District Court under original, not 'pendent,' jurisdiction." Brief for WMATA at 27. Thus the court erred in refusing to hear Gary's common law tort claims against WMATA.

In arguing that the district court erred in refusing to exercise pendent jurisdiction over the common law tort claims against both WMATA and Long, Gary relies on subsection (a) of 28 U.S.C. § 1367 (Supp. III 1991), which provides that

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy....

Under subsection (c), however, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a)" under any one of four circumstances.

*Id.* § 1367(c). As we have recently pointed out, "[w]hether actually to decide [the pendent claims] is a matter left to the sound discretion of the district court, guided by consideration of the factors enumerated in 28 U.S.C. § 1367(c).... " *Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260, 1265–66 (D.C.Cir.1995).

The district court may or may not have erred in declining to exercise supplemental jurisdiction over the common law tort claims against Long; but without knowing its reasons, we cannot determine whether it abused its discretion under the statute, or even whether it had any to exercise. Because the common law claims against him were "so related to [the common law] claims [against WMATA] ... that they form part of the same case or controversy ...," 28 U.S.C. § 1367(a), the district court clearly had pendent jurisdiction over them. Whether it had the authority to refuse to hear them depended on the presence of one of the factors described in section 1367(c).

Accordingly, we remand the question to the district court. If it determines that it has the authority to decline supplemental jurisdiction over the common law claims against Long and decides to exercise it, the district court should either remand the claims to the courts of the District of Columbia or dismiss them without prejudice to permit Gary to file her claims there. *See Edmondson & Gallagher,* 48 F.3d at 1267.

### III. CONCLUSION

The goal of Title VII is "to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404 (internal quotation marks omitted). Discriminatory conduct that is so severe or pervasive that it creates a work environment abusive to employees because of their sex offends this "broad rule of workplace equality." *Harris,* —— U.S. at ——, 114 S.Ct. at 371. The mere fact that an individual perpetrates sexual misconduct while in the employ of another, however, does not *ipso jure* render that action violative of Title VII.

On applying traditional common law principles of agency to the facts before us, we hold

that Gary has failed to support her Title VII sex discrimination claim against WMATA on either a *quid pro quo* or hostile work environment basis. She failed to establish the first because Long did not exercise his delegated authority to impose economic harm on her. Nor could she hold WMATA responsible for Long's creation of a hostile work environment because in light of WMATA's preventive policies and remedial practices, Gary knew, or should have known, that Long's conduct was unauthorized.

We therefore affirm the district court's dismissal of Gary's Title VII claim against WMATA. We also affirm the magistrate judge's dismissal of that claim against Long because Title VII does not impose individual liability on supervisory employees. We remand the common law claims against WMATA and Long, however, because the district court has original jurisdiction over the former and must consider the propriety of asserting pendent jurisdiction over the latter.

*So ordered.*