**Jonna SNAPP–FOUST**

v.

**NATIONAL CONSTRUCTION, LLC.**

No. 3:96–0395.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 15, 1997.

Louise Rocker Fontecchio, Nashville, TN, for Plaintiff.

Dianna Baker Shaw, Stephen H. Price, Nashville, TN, for Defendant.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

This action alleges sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Tennessee Human Rights Act, Tenn.Code Ann. § 4–21–401, *et seq.* Pending before the Court is Defendant National Construction's Motion for Summary Judgment (Doc. No. 9). Plaintiff Jonna Snapp–Foust submitted a Response (Doc. No. 15), to which Defendant filed a Reply (Doc. No. 20). For the reasons outlined below, the Court denies the motion.

### I. Factual background

Plaintiff was hired by Defendant on July 24, 1995 to work as Field Accountant at one of the Defendant's Nashville construction sites, the Terrace Park Apartments on Elm Hill Pike. The Field Accountant job was a permanent, full-time position. Plaintiff was told that she reported to Brenda Munoz,[1] who in turn reported to Walt Shepard, Project Manager. However, Ms. Munoz did not work at the Elm Hill site, but rather worked out of Defendant's main office. At the Elm Hill site, Jerry Bales was Superintendent, and William Finney was Assistant Superintendent. Plaintiff and the other Elm Hill employees worked out of a trailer which had been outfitted with office spaces.

During the first two weeks of her employment, Plaintiff alleges that Finney verbally sexually harassed her on a daily basis. Plaintiff contends that Finney made comments regarding Plaintiff's walk and dress, tried to guess what color underwear Plaintiff was wearing and what size bra she was wear-ing, and told Plaintiff that he could see her bra. Plaintiff also alleges that Finney would attempt to discuss his sexual exploits with her. Plaintiff avers that she responded to Finney's behavior by alternately ignoring or reproaching him, and that Finney would back off temporarily. Plaintiff also notes that these incidents only occurred when she and Finney were alone in the trailer, and that Finney would behave professionally if others were in the office.

Two weeks into Plaintiff's employment, on Monday, August 7, 1995, Finney was temporarily reassigned to another site for two days. Plaintiff states that this reassignment was part of a general shuffling of personnel among Elm Hill and other sites resulting from the departure of an employee at another site. Plaintiff alleges that when Finney returned to the Elm Hill office on August 9, his harassment escalated and became physical: Finney would run his hand up Plaintiff's leg and between her thighs; on one occasion, Finney grabbed Plaintiff's breast, and on another, he attempted to place his hand inside the waistband of Plaintiff's pants. Plaintiff contends that on these occasions she pushed Finney's hands away and verbally rebuked him.

On the morning of August 10, Plaintiff had business at Defendant's central office. While there, she spoke with Brenda Munoz about her general progress on the job. Plaintiff informed Munoz about Finney's behavior.[2] What Munoz then told Plaintiff after learning of her allegations is in significant dispute: Defendant contends that Munoz told Plaintiff that such conduct was prohibited and offered to speak to Finney, or to have Project Manager Shepard do so. Defendant alleges that Plaintiff rejected such offers, asking Munoz to keep the matter confidential and telling her that she felt she could handle the situation on her own because she had built up a

---

1. Ms. Munoz's exact title is uncertain: Defendant refers to her as "the Office Manager," (Def's Mem. Supp. Mot. Summ. J. at 3). However, Plaintiff states in her Affidavit submitted with her deposition that Munoz was "Regional Secretary," (Snapp–Foust Dep. Aff., Ex. 2 at 1), while her Memorandum in Opposition refers to Munoz as "Secretary to [the Project Manager]." (Pl.'s Mem. Resp. at 3.) Ms. Munoz's true title is immaterial for purposes of this Memorandum.

2. Defendant contends that Plaintiff only told Munoz about one physical incident, involving Finney's placing his hand on Plaintiff's thigh. (Def.'s Mem. Supp. Mot. Summ. J. at 5.)

rapport with Finney. Moreover, Defendant contends that Plaintiff admitted to Munoz that she had possibly encouraged such behavior with her own conduct, which included engaging in sexual banter and discussing pornographic movies. Munoz states in her affidavit that she honored Plaintiff's request, and did not report Finney's conduct to her superiors.

Plaintiff disputes Defendant's version of her conversation with Munoz, although her own account is somewhat conflicted. In her Affidavit filed with the Equal Employment Opportunity Commission and included with her deposition, Plaintiff states that Munoz told her that it was Plaintiff's responsibility to tell Finney to stop harassing her, and that she should report Finney's behavior to Superintendent Jerry Bales. (Snapp–Foust Dep. Aff., Ex. 2 at 2.) In her deposition, however, Plaintiff states that Munoz "said not to worry about it. And I said, Well, should we say something to [Project Manager] Walt [Shepard]? She said she would take care of it. She would—she told me he would not be at that job site much longer and—but that they would take care of it.... And she told me that if I had any more problems that I might say something to Jerry [Bales]." (Snapp–Foust Dep. at 46–47.) Plaintiff notes that nothing came of her conversation with Munoz,[3] and that Finney was in the office as usual on Friday, August 11, continuing his physical and verbal harassment of Plaintiff.

Plaintiff also contends that in the afternoon on Thursday, August 10, the same day she spoke with Munoz, she had a conversation with Carlos Ruble, her "technical supervisor" (Pl.'s Mem. Resp. at 5) in the accounting department of the Defendant's corporate headquarters in Cincinnati, Ohio. In speaking with Ruble about accounting matters, Plaintiff told Ruble about the trouble she was experiencing with Finney, and that she had spoken with Munoz about the harassment.

Plaintiff alleges that she spoke with Ruble "in hopes that perhaps he could talk with the persons in the Nashville office to correct the problem." (Snapp–Foust Aff., Ex. 2 at 3.) Plaintiff states that Ruble told her that she had acted properly, assured her that Munoz would deal with the situation, and instructed that if Plaintiff experienced any further problems she should tell him. (Snapp–Foust Dep. at 22.)

Plaintiff also complained about Finney's conduct to Superintendent Jerry Bales, and told him that she had spoken with Munoz about it, as well.[4] Plaintiff testified in her deposition that Bales "told me not—that I didn't have anything to worry about. Bill [Finney] was not going to be back at the site. He was moved to another site and he would be there, period." (Snapp–Foust Dep. at 50.) As is made evident in Project Manager Walt Shepard's Affidavit, Bales immediately informed Shepard of Plaintiff's complaint. (Shepard Aff., Ex. 1(A) at 1.)

Finney was absent from the Elm Hill job site on Monday, August 14 through Wednesday, August 16, the date on which Plaintiff was terminated. Defendant avers that Finney was moved from the Elm Hill site in direct response to Plaintiff's complaint, thereby extinguishing any liability. Plaintiff disputes this contention, and instead argues that Finney's absence from the Elm Hill site was simply the coincidental result of the temporary shuffling of management personnel around to several sites. She argues that Finney could have returned to the Elm Hill site at any time, and consequently, that Defendant failed to respond to known harassment. The only reason that contact between Plaintiff and Finney did not resume, Plaintiff contends, is because she was terminated.

On the morning of August 16, Project Manager Walt Shepard told Plaintiff that he had decided to combine her job duties with

---

3. Defendant evidently concedes that Munoz did not act upon the information Plaintiff provided her, though it argues that Munoz was simply honoring Plaintiff's request for confidentiality.

4. The date of this conversation is uncertain. In deposition Plaintiff initially could not recall whether she spoke with Bales on Friday the 11th or Monday the 14th, (Snapp–Foust Dep. at 48–

49), but then appeared to recollect that she attempted to reach Bales on Friday, but was not successful until Monday. The Court will assume that the conversation occurred on Friday the 11th, in light of the fact that Project Manager Walt Shepard's Affidavit states that he learned of Plaintiff's complaint from Bales on that date.

those of a Field Accountant at another site, and consequently that her position was being eliminated.[5] Shepard told Plaintiff to gather her belongings and to leave that day. Plaintiff asked if the decision to terminate her was related to her complaints about Finney, but Shepard denied that it was. He did not inform her of any performance problems which may have led to her termination.[6] Plaintiff contends that she was terminated not because of legitimate business reasons but in retaliation for her complaints about Finney.

Plaintiff filed a charge with the Equal Employment Opportunity Commission and received a right-to-sue letter on January 29, 1996. Plaintiff filed the instant action on April 29, 1996.

## II. Legal standard for summary judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In order to grant summary judgment, the Court must determine that a reasonable jury would be unable to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of proof that no genuine issues of material fact are present. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, the facts, and

reasonable inferences to be drawn from those facts, must be viewed in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

To defeat a motion for summary judgment, the opposing party must come forward with "more than just some metaphysical doubt as to the material facts." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Where the record in its entirety would not lead a jury to find for the non-movant, a genuine issue of material fact does not exist. *Id.* at 1478. Material facts are those which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson*, 477 U.S. at 247–48. Mere allegations of a factual dispute are not sufficient to meet this standard. *Id.*

## III. Discussion

### A. The sexual harassment claim

Title VII of the Civil Rights Act of 1964 prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1).[7] It is well-settled that sexual harassment falls within the definition of proscribed sex discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Two general categories of sexual harassment have been recognized by the courts: *quid pro quo*, in which tangible job benefits are conditioned upon compliance with certain sexual demands, and hos-

---

**5.** In her Affidavit, Brenda Munoz also states, "To my knowledge Joanna [sic] employment was terminated because of a desire to reorganize our accounting staff to make it more accurate and cost effective. I have talked to Walt in great detail about our present system and in trying out a system which would allow one Field Accountant to work two projects at once." (Munoz Aff., Ex. 2(A) at 2.)

**6.** When Plaintiff called Brenda Munoz later that day to ask why she was being terminated, she again asked whether her performance had been deficient. Plaintiff alleges that Munoz responded, "No, you've been fine." (Snapp–Foust Dep. at 61.)

**7.** The analogous portion of the Tennessee Human Rights Act, Tenn.Code Ann. § 4–21–401(a)(1) (THRA), includes language identical to Title VII, stating that it is unlawful for an employer "to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's ... sex...." Since the purpose of the state statute is to effectuate the federal civil rights laws within Tennessee, the analysis used for Plaintiff's Title VII claim is the same for the THRA. *See Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996).

tile environment, in which sexual conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Id.* at 65. Only hostile environment sexual harassment is alleged in this case.

■ To succeed on a hostile environment claim, a plaintiff must prove that: (1) the plaintiff is a member of a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive employment environment; and (5)

the employer knew or should have known of the harassment and failed to respond with prompt, appropriate corrective action. *See, e.g., Harris v. Forklift Sys.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 619–20 (6th Cir.1986).

■ Defendant in this case appears not to deny that Plaintiff satisfies the first four factors listed above, and thus was subjected to hostile environment sexual harassment.[8] Rather, it argues that it extinguished its liability for such harassment by its timely and effective remedial action.[9] Specifically, Defendant contends that once it received actual notice from Plaintiff, which it dates as

8. Defendant also appears to lay the groundwork for an additional defense by insinuating that Plaintiff encouraged such conduct with her own behavior. It alleges that Plaintiff admitted to Munoz that she her talk of pornographic movies may have caused Finney to harass her, and Walt Shepard's affidavit includes the statement that "I was informed by both Bill [the alleged harasser in this case] and Jim [Lesmeister, another Assistant Superintendent assigned to the site during the personnel shuffling] that [Plaintiff] had been quoting obscene stories and that they were uncomfortable listening to such stories because at time's [sic] their [sic] were subcontractor's [sic] personnel present during these stories." (Shepard Aff., Ex. 1(A) at 1.) However, given the fact that Defendant does not contest in its Memorandum that harassing conduct occurred and that a duty to remedy it existed, the Court considers allegations about Plaintiff's conduct to be irrelevant.

9. Defendant argues in a footnote that no obligation to act was even triggered in this case, since Plaintiff failed to utilize the company's established complaint procedure for harassment. That policy requires putting the complaint in writing and sending it to the Personnel Officer at the company's headquarters in Cincinnati. According to the policy, an investigation of the complaint will be conducted, and the complaining employee will be "advised promptly, by letter of the results of the investigation and the actions, if any, taken by the Company." (Shepard Aff., Ex. 1(A) at 44–45.)

Defendant's argument is fatally flawed for several reasons. Most notably, Defendant mischaracterizes the holding of the case it cites in support of this argument, *Gary v. Long,* 59 F.3d 1391 (D.C.Cir.1995). *Gary* does not stand for the proposition that *any* failure by an employee to utilize a grievance procedure extinguishes employer liability. In *Gary,* the plaintiff did not utilize a grievance procedure that was well-disseminated by the employer, who "had sponsored

seminars on the subject, distributed staff notices to all employees informing them that sexual harassment would not be tolerated, publicized its Civil Rights policy statement, and made available to all employees the names and telephone numbers of the EEO Counselors to whom they could report acts of discrimination." 59 F.3d at 1398. Moreover, the plaintiff in *Gary* had worked for the employer for five years before she experienced the alleged harassment, making it virtually certain that she knew of the anti-harassment policy and the grievance procedure. Finally, the harassment had continued for two years before the Plaintiff reported it.

In this case, the employer's sexual harassment policy and grievance procedure is detailed on a single page in the sixty-page employee handbook. Defendant has produced no evidence of any further dissemination of the policy or of any training of personnel regarding complaint procedures. Plaintiff in this case, a new employee, was harassed practically from the day she began her employment with Defendant. She reported the harassment within two weeks to the only supervisory personnel with whom she had personal contact, Munoz and Bales, and discussed it with a third supervisor, Assistant Superintendent Jim Lesmeister. She also consulted Carlos Ruble, a supervisor in the Cincinnati headquarters, in an effort to ascertain what further action she should take. In light of the fact that none of these four supervisory employees to whom the Plaintiff complained advised her that the established company procedure was to write a letter to the Cincinnati Personnel Officer, Plaintiff's failure to do so should not release Defendant from its obligation to act. The Court notes that Defendant's agents themselves failed to follow the established company procedure for handling such complaints. Instead, as will be discussed further *infra,* it conducted an investigation that was hardly thorough—given that Plaintiff was not even interviewed—and it failed to convey the results of Shepard's investigation to Plaintiff, in writing or otherwise.

Friday, August 10—the day Plaintiff spoke to Brenda Munoz [10]—within one day it removed Finney from Plaintiff's job site. (Def.'s Mem. Supp. Mot. Summ. J. at 9.) [11]

The Court believes that a material question of fact remains as to whether Finney was in fact transferred to another job site in response to Plaintiff's complaint. Defendant's filings provide no support beyond bare assertion for the proposition that Finney was transferred as a disciplinary action and not as a result of other business logistics—the same logistics that had removed Finney from the Elm Hill site on August 7 and 8. Indeed, the Affidavit submitted by Project Manager Walt Shepard indicates that quite the opposite is true. Shepard states that he was informed by Superintendent Jerry Bales on Friday, August 11, of "an incident with Bill Finney in the field trailer ... [that] had taken place the previous week." (Shepard Aff., Ex. 1(A) at 1.) Shepard goes on to say that he questioned "Bill [Finney] and Jim [Lesmeister] about the incident. Upon returning to the office I spoke to Brenda *and found no need for further action* .... I have no reason to believe any of [Plaintiff's] stories that she may have said during or after her employment." (*Id.* at 1–2.) (Emphasis added.) Given that Defendant has not produced any evidence which indicates remedial purpose in transferring Finney—such as evidence that Finney was reprimanded, counseled, or otherwise notified that he had violated company policy in his treatment of Plaintiff and that his transfer was intended to prevent further infractions—Shepard's dismissive opinion of Plaintiff's charges must be taken at face value.

Defendant is incorrect in arguing that it is "irrelevant" whether Defendant transferred Finney to another site coincidentally, and that the key inquiry is simply whether Finney's removal resulted in an end to the harassment against the Plaintiff. (Def.'s Reply Mem. at 3.) First, Defendant ignores a fundamental premise of the remedial standard: for an employer's "response" to be considered "adequate," it must first be established that there was actually any "response" at all. Without such a requirement, employers' role in assuring compliance with Title VII is significantly eviscerated.

Furthermore, even if the Court assumes that coincidental transfer of a harasser qualifies as a "response," a significant question still exists as to whether the move of Finney was indeed "adequate" and "reasonably calculated" to remedy his harassment of Plaintiff. As attested to by Project Manager Shepard, the company's investigation of Plaintiff's claims did not include an interview with Plaintiff herself to discover the scope of her complaints or the remedies she desired, although it did include an interview with Finney. Moreover, the only certainty established by Defendant is that Finney was not at the Elm Hill site on August 14, 15, and 16.[12] Defendant has not presented any evidence that Finney's transfer actually would have cured the harassment in this case; specifically, it does not explain why the Court should not view Finney's transfer on the 14th through the 16th as just another temporary transfer, like the one that took Finney out of the Elm Hill office on August 7th and 8th, and which would have put Plaintiff back into contact with Finney at Elm Hill at some point in the future. Indeed, the only reason before the Court why Plaintiff did not have further contact with Finney after August 14th was that she was fired three days after his transfer. This last point is especially salient given the Court's conclusion, discussed *infra,* that a question of material fact exists as to whether Plaintiff's termination

---

10. The Court expresses no opinion here as to whether Defendant could be deemed to have had constructive notice of Finney's harassment at an earlier date.

11. Defendant suggests that it was not obligated to act immediately upon Plaintiff's complaint lodged with Brenda Munoz on the 10th, and to remove Finney from the Elm Hill site on Friday the 11th, because it alleges that Plaintiff asked Munoz to keep the matter secret. Even if Defen-

dant's characterization of the conversation between the women is true, the Court is skeptical of the assertion that a harassed employee's requests for confidentiality absolve an employer of all responsibility to investigate and eliminate known discrimination.

12. Plaintiff does not know Finney's current employment status with Defendant or the location of such employment, and Defendant's filings are silent on the subject.

was retaliatory; to deem Defendant's response "adequate" because it removed a harasser from a complainant's environment for three days until it could punitively fire her would create perverse incentives for employers, to say the least.

Even if Plaintiff's firing was justified, however, an employer is not permitted to gauge its response to harassment according to the expected duration of a complainant's employment. Indeed, such an approach ignores the fact that the remedial requirement is imposed not only to assure that a specific employee is never harassed again by the harasser, but also to serve a crucial education and deterrence function in the entire workplace, both as to the harasser's contacts with other employees, and as to other potential harassers. The confluence of circumstances alleged by the Defendant—the harasser was going to be transferred anyway, and Plaintiff was a substandard employee who left three days into the harasser's absence, but for those three days Plaintiff was "satisfied" with the employer's "response"—simply falls far short of the kinds of diligent employer responses that courts have found "adequate" and "reasonably calculated" to end harassment. *See, e.g., Fleming v. Boeing Co.,* 120 F.3d 242, 247 (11th Cir.1997) (harasser was "demoted, his pay was decreased, and [the plaintiff] was assigned to a different supervisor"); *Wathen v. General Elec. Co.,* 115 F.3d 400, 403 (6th Cir.1997) (footnotes omitted) (employer "conducted an internal investigation which resulted in [one of the harassers'] termination, a written reprimand against [another harasser], [and the employer issued] public apologies to [the plaintiff]"); *Spicer v. Com. of Va. Dept. of Corrections,* 66 F.3d 705, 708 (4th Cir.1995) (after receiving complaint from prison employee, within next two days equal employment officer met with plaintiff, and told warden to investigate plaintiff's allegations; warden met with plaintiff, and counseled individual harassers and threatened them with disciplinary action if conduct repeated; equal employment officer led sexual harassment training for employees, and a second training one month later; and equal employment officer wrote plaintiff a letter detailing remedial action taken and willingness to discuss any further problems);

*Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178, 181 (6th Cir.1992) (harasser terminated immediately after allegations received); *cf. Yates v. Avco Corp.,* 819 F.2d 630, 633, 636 (6th Cir.1987) (where harasser "drastically demoted, and received a substantial cut in salary," remedy found to be adequate only as to harasser, but not plaintiffs, since records of excessive absenteeism due to harassment were not purged from their personnel files).

### B. The retaliation claim

Title VII's anti-retaliation provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made unlawful by [42 U.S.C. § 2000e], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). In order to make out a *prima facie* case of retaliation under this provision, a plaintiff must show that "(1) he was engaged in activity protected under Title VII; (2) he was the subject of an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action existed." *Johnson v. Department of Health & Human Servs.,* 30 F.3d 45, 47 (6th Cir.1994).

A retaliation claim is treated like any other disparate treatment case, and follows the same burden-shifting framework. *Id.* Consequently, once the *prima facie* claim of retaliation is made out by the plaintiff, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Texas Dep't of Community Affs. v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant carries this burden, the plaintiff must then produce "sufficient evidence to allow a jury to reasonably reject [the employer's] explanation" as a pretext for discrimination. *Id.* The Supreme Court in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), made clear that "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's ex-

planation of intentional discrimination." It should be noted that because direct evidence of discriminatory motive is rarely available, the same evidence which aids in building the *prima facie* case may also be considered at the pretext stage. *Trentham v. K–Mart Corp.*, 806 F.Supp. 692 (E.D.Tenn.1991), *aff'd*, 952 F.2d 403 (6th Cir.1992).

Plaintiff clearly meets the first two criteria in the retaliation *prima facie* case. The contested issue is whether a causal link exists between her complaints about Finney's harassment and her termination. The Court concludes that a sufficient question of material fact exists as to this link. Moreover, it finds sufficient doubt as to whether Defendant's articulated reason for terminating Plaintiff is pretextual to deny summary judgment.

 While proximity in time between the protected activity and the adverse employment action does not alone prove a retaliation claim, it does meet the less onerous burden of providing the causal link necessary for the *prima facie* case. *See e.g., Wrenn v. Gould*, 808 F.2d 493, 501 (6th Cir.1987); *Van Richardson v. Burrows*, 885 F.Supp. 1017, 1023 (N.D.Ohio 1995) (*citing Wrenn*). Given that Plaintiff was terminated within five business days of making her first complaint to management about Finney's harassment, the Court finds that the causal link has been sufficiently established to satisfy the *prima facie* case here.

 The legitimate nondiscriminatory reason for Plaintiff's termination offered by Defendant is that it consolidated the duties of two Field Accountants into one job. The Court finds this explanation to be in significant doubt. Defendant has offered no evidentiary support to show that such a decision was actually made or instituted, and provides no explanation of why Plaintiff was the one chosen for termination, who assumed Plaintiff's duties, how such a consolidation served

to make Defendant's operations more efficient, or why this decision was made just three weeks into a new, full-time, permanent worker's employment. Moreover, Defendant attempts to characterize the consolidation decision as part of an overall strategy at several sites,[13] yet provides no evidence that other Field Accountants were terminated as part of such a strategy.

Furthermore, the record shows that Project Manager Shepard has been inconsistent in his statements regarding the reason for Plaintiff's discharge, raising some doubt as to his veracity. The termination report he prepared for the company's files, for example, stated the "Reason for Termination" as, "Failure to complete Job Duties and no longer needed. For restructuring of the Field Clerk position." (Shelton Aff., Ex. E.) When Plaintiff applied for unemployment compensation following her termination, an employee of the Tennessee Department of Employment Security, Diane Shelton, interviewed Shepard regarding the reasons for Plaintiff's termination. Shepard told Shelton that Plaintiff was fired for gossiping on the job and failing to devote sufficient attention to her work. He said that he had spoken with Plaintiff on more than one occasion about this problem, although he did not know dates. (Shelton Aff., Exs. C & D.)[14] In a document Shepard filed with the Department, in the section titled "Reason for Separation," Shepard stated, "Company was being restructured and she was no longer needed." (Shelton Aff., Ex. A.) Another form filed with the Department shows "Dissatisfied with work performance and change of Job Duties" as the "Reason for Separation." (Shelton Aff., Ex. B.)

Finally, Plaintiff states in both her Affidavit and her deposition that she spoke with Carlos Ruble in the accounting department of corporate headquarters following her ter-

---

13. *See* Def.'s Mem. Supp. Mot. Summ. J. at 12 ("The purpose of this reorganization was to make the field accounting staff 'more accurate and cost effective' by 'allow[ing]' one Field Accountant to work on two projects at once.") (*quoting* Munoz Aff., Ex. 2(A) at 2).

14. In his Affidavit, Walt Shepard mentioned one instance of Plaintiff failing to properly complete some paperwork that she had submitted to him, but did not mention any problems with gossiping. Defendant's filings in connection with this Motion also contain no allegations of poor work performance due to gossiping, nor any documentation of such problems.

mination, and that Ruble represented to her that he had no knowledge of Defendant's plans to consolidate Field Accountant positions. (Snapp–Foust Aff., Ex. 2 at 5, ¶ 9; Snapp–Foust Dep. at 65.) Indeed, Plaintiff avers that Ruble told her that it would have been part of his job responsibilities to approve such plans. (Snapp–Foust Aff., Ex. 2 at 5, ¶ 9; Snapp–Foust Dep. at 65.)

Defendant argues that Plaintiff's account of Ruble's comments would be inadmissible hearsay, and should not be considered by the Court. Second, Defendant disputes Plaintiff's characterization of Ruble as a management level employee who would necessarily have control over, or even knowledge of, such a decision; instead, Defendant dismisses Ruble as "a former accountant in Ohio who occasionally provided technical assistance to plaintiff." (Def.'s Reply Mem. at 5.) Finally, Defendant argues that any lack of knowledge by Ruble "suggests only that one accountant in Ohio was not familiar with the independent decision of Walt Shepard and Brenda Munoz in Nashville to restructure the field accounting staff there." (*Id.*)

The Court agrees that Plaintiff's statement about Ruble's remarks would be hearsay if presented at trial, and consequently does not accord it extraordinary weight. However, Plaintiff notes in her Affidavit that she and her attorney have attempted to contact Ruble to obtain his affidavit, but that he has left National Construction's employ and they have been unable to locate him as yet. Presumably, they would be able to make such contact by the time of trial.

Moreover, the Court is not persuaded that Ruble's lack of knowledge is wholly without probative value—at least at this stage of the litigation, within the totality of the evidence presented by Plaintiff, and particularly in light of the incomplete evidence provided by the Defendant regarding the articulated non-discriminatory reason for its decision to terminate Plaintiff. Plaintiff testified in deposition that she was "told [she] was supposed

to" report to Ruble regarding certain accounting paperwork, (Snapp–Foust Dep. at 21), and that she also called Ruble with questions about performing her accounting work on her computer (*Id.* at 26.) Plaintiff also testified in deposition that her accounting work was eventually sent to Ruble for inspection. (*Id.* at 63.) Furthermore, conversations about Plaintiff's accounting duties were to occur regularly on approximately the 10th and 20th of every month, when "payables" were processed. (*Id.* at 26.) Indeed, even Defendant's counsel noted at deposition, when hearing the schedule of Plaintiff's calls to Ruble in Cincinnati, "There's a system here. I can tell." (Snapp–Foust Dep. at 27.) Based on such evidence, the Court feels confident in concluding that Ruble had some degree of formal supervision over the accounting functions of Defendant's operations. At the very least, the Court will assume that Ruble would have at least been aware of an impending change in the identity of the person from whom he would be receiving accounting information, and to whom he could direct queries about accounting at the Elm Hill site. Defendant's blanket denial that Ruble had any supervisory contact whatsoever with Plaintiff does nothing to challenge such a perception.

The Court is similarly unconvinced by Defendant's argument that an accounting staff member in Cincinnati could not possibly have been aware of Defendant's personnel decisions in Nashville. For example, as Defendant itself noted, employees who have complaints about sexual harassment are directed to send a letter to an officer in Cincinnati.[15] Clearly, then, Defendant does not enjoy total independence from headquarters in its management of personnel. Without a fuller explanation from Defendant about what motivated its decision to consolidate the accounting staff or how the new staff operates, the Court can only take at face value the fact that Plaintiff's contact at corporate headquarters had no knowledge of her job's supposed pending elimination. Consequent-

---

15. Indeed, it is ironic that Defendant is so dismissive of the notion that Ruble would have knowledge of a reconfiguration of Defendant's accounting staff, given its argument that Plaintiff should not even be deemed as a matter of law to

have reported Finney's harassment because she did not send a letter to an officer in corporate headquarters but instead spoke with three management personnel in Nashville.

ly, it can only be skeptical of Defendant's stated motivation for terminating Plaintiff.

In light of this skepticism, as well as the affirmative evidence presented by Plaintiff raising an inference of unlawful intent, the Court finds that a jury could reasonably conclude that Defendant's stated reason for Plaintiff's discharge was a pretext for retaliation.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgement is denied. An Order consistent with this Memorandum shall be filed contemporaneously.