# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 14, 2005       Decided February 3, 2006

No. 04-5058

JANET L. LUTKEWITTE,
APPELLANT

v.

ALBERTO GONZALES, ATTORNEY GENERAL,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02484)

---

*Tracy L. Gonos* argued the cause for appellant. With her on the briefs was *George M. Chuzi.*

*Heather Graham-Oliver*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan*, Assistant U.S. Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: TATEL and BROWN, *Circuit Judges*, and EDWARDS,[*] *Senior Circuit Judge*.

Opinion for the Court filed *Per Curiam*.

Opinion concurring in the Judgment filed by *Circuit Judge* BROWN.

*Per Curiam*:  This cause was considered on the record from the United States District Court for the District of Columbia, and was briefed and argued by counsel.  It is hereby Ordered and Adjudged that the judgment of the District Court is affirmed.

————————————————

Throughout 1999, appellant, Ms. Janet Lutkewitte, who is employed by the Federal Bureau of Investigation ("FBI"), was sexually harassed by her supervisor, David Ehemann.  During this period, Ehemann engaged in repugnant and reprehensible conduct by harassing Ms. Lutkewitte with unwelcome sexual advances, including forced submission to his sexual demands. Appellant filed suit in the District Court on October 17, 2000, against both Ehemann and the Attorney General of the United States in his official capacity, alleging *quid pro quo* sexual harassment, hostile work environment, and retaliation in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. (2000).  Ms. Lutkewitte settled with Ehemann on the eve of trial.  The District Court entered judgment for the Government on December 19, 2003, following a jury verdict.

————————————————

[*] Senior Circuit Judge Edwards was in regular active service at the time of oral argument.

During the course of the trial, Ms. Lutkewitte asked the trial court to give the following "tangible employment action" instruction to the jury:

> If you find that Ehemann sexually harassed the plaintiff, then you must find the FBI liable for that harassment if you find that any of the following is true:
>
> (1) Ehemann used his authority as plaintiff's supervisor at the FBI to compel her attendance at an inspection in New York enabling him to take advantage of her; OR
>
> (2) Ehemann's words or conduct would have communicated to a reasonable person in the Plaintiff's position that she would suffer negative job consequences if she did not submit to his sexual demands; OR
>
> (3) Ehemann gave Plaintiff certain favorable job benefits because she submitted to his sexual demands.

Joint Appendix ("J.A.") 254-55 (footnotes omitted). The trial judge, however, declined to instruct the jury to consider whether Ehemann's sexual harassment of Ms. Lutkewitte culminated in a tangible employment action.

On a Special Verdict Form, the jury found that (1) appellant had proven a hostile work environment, (2) the FBI had proven that it exercised reasonable care to prevent any sexually harassing behavior on the part of Ehemann, (3) the FBI had proven that it exercised reasonable care to promptly correct any sexually harassing behavior by Ehemann, and (4) the FBI had proven that Ms. Lutkewitte unreasonably failed to take advantage of the preventive and corrective opportunities provided her, or that she otherwise unreasonably failed to avoid harm. *Id.* at 325. The jury thus entered a verdict for appellee on the claim of hostile work environment sexual harassment. *Id*.

The jury also entered a verdict for appellee on the claim of retaliation. *Id*. at 326.

In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court "delineate[d] two categories of hostile work environment claims: (1) harassment that 'culminates in a tangible employment action,' for which employers are strictly liable, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense." *Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004) (quoting *Ellerth*, 524 U.S. at 765, and citing *Faragher*, 524 U.S. at 807-08). In explaining when an employer is subject to vicarious and strict liability to a victimized employee for an actionable hostile environment created by a supervisor, the Court offered the following guidance:

> At the outset, we can identify a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate. Every Federal Court of Appeals to have considered the question has found vicarious liability when a discriminatory act results in a tangible employment action.
>
> . . . .
>
> . . . A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.
>
> . . . .

When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury.

. . . .

In order to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in *Faragher v. Boca Raton*. . . . An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages. . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth*, 524 U.S. at 760-62, 764-65.

On appeal, appellant claims that the District Court "committed reversible error when it failed to give the jury a tangible employment action instruction permitting it to find that

the FBI was strictly liable for Ehemann's sexual harassment of Lutkewitte." Br. for Appellant at 16. In advancing this claim, Ms. Lutkewitte asserts that *Faragher* and *Ellerth* "compel the conclusion that a 'tangible employment action' occurs when a subordinate is coerced into submitting to a supervisor's sexual demands for fear of losing her job or otherwise being penalized with respect to the terms and conditions of her employment." *Id.* at 17. On this reading of the case law, she contends that the District Court was obliged to find, as a matter of law, that "Ehemann's sexual harassment culminated in a tangible employment action thereby rendering the FBI strictly liable," *id.* at 18, or at least to submit the question to the jury, *id.* at 16-18. Under this view, Ms. Lutkewitte must produce record evidence that her job or significant employment benefits were conditioned on her sexual submission. *See Holly D. v. Cal. Tech.*, 339 F.3d 1158, 1174 (9th Cir. 2003); *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 98 (2d Cir. 2002). Without ruling on the validity of Ms. Lutkewitte's legal theory, we reject both of her contentions as the record before us contains no such evidence.

We reject appellant's first two proposed instructions out of hand. Ehemann's directive to appellant that she come to New York where she may have been more vulnerable to his advances was not a tangible employment action. While his order may have conditioned appellant's job on her attending the New York conference, it did not condition either her job or benefits on submission to Ehemann's subsequent advances. As for appellant's claim that she feared losing her job if she did not submit, there is insufficient evidence to justify considering her submission itself a tangible employment action. Appellant offered nothing to suggest that Ehemann implicitly or explicitly conditioned her continued employment on her acquiescence to his sexual overtures.

Appellant's brief principally focuses on her contention that her ability to receive job-related benefits was conditioned on her

submission to Ehemann's demands. At trial, appellant attempted to show both that she received job benefits and advancements and that those benefits and advancements were conditioned on her sexual submission to Ehemann. Specifically, appellant's brief contends that, "shortly after [appellant] acquiesced to his advances, Ehemann approved and paid for unlimited overtime work totaling approximately $23,000, payments he had previously refused to authorize; he obtained a *brand new* government car for her use[;] . . . . [and] during the period when he was sexually imposing himself on her on a daily basis, he took tangible steps to promote [appellant] by expanding her staff and supervisory responsibilities." Br. for Appellant at 29-30. The record, however, is devoid of any evidence to support the existence of a "tangible employment action," and nowhere indicates that any of the job benefits she received were conditioned on her sexual submission to Ehemann.

First, appellant's assertion that her receipt of a "brand new" car in 1999 was evidence of a tangible employment action is specious. Ms. Lutkewitte already had a take-home car, Trial Tr. at 89, (12/16/03), J.A. 99, so a *new* one created no significant change in her ability to effectively perform her job duties or on the conditions of her employment and, therefore, was not a "tangible" benefit. *See Ellerth*, 524 U.S. at 761 (requiring tangible employment actions "constitute a significant change in employment status such as . . . a significant change in benefits"); *Roebuck v. Washington*, 408 F.3d 790, 793 (D.C. Cir. 2005) (requiring tangible employment actions have a "significant effect" on a plaintiff's employment status, work, or benefits). In addition, appellant's brief contends that Ehemann repeatedly denied her rightful access to her original take-home vehicle, *see* Br. for Appellant at 4, but nothing presented at trial confirms this claim. Ms. Lutkewitte never asserted at trial that Ehemann had previously improperly denied her a car. Indeed, Government witness Edward Shubert, the assistant special agent

in charge of the administrative services division of the FBI at the time, testified that take-home vehicles were assigned "based on the needs of the FBI, in this case, the needs of the Washington field office." Trial Tr. at 107 (12/17/03), J.A. 146. Appellant therefore presented no evidence remotely suggesting that Ehemann's approval of her access to a new car was conditioned on her sexual acquiescence.

Appellant's claim that Ehemann allegedly took "tangible steps" to put her in a position to receive a promotion proves nothing. For one thing, there is no evidence in the record to indicate that appellant was ever promoted. *See id.* at 31, J.A. 68. Furthermore, in the context of appellant's claim, the two relevant actions allegedly taken by Ehemann – his effort to obtain a GS-14 position description for appellant and his oversight of the augmentation of appellant's staff – simply do not rise to the level of "tangible employment actions" under *Faragher* and *Ellerth*. Ms. Lutkewitte asserted, but never submitted any admissible evidence to prove, that staff augmentation was an important step toward promotion, and never argued that the expansion of her staff led to reduced workload or that increased supervisory authority alone was a tangible benefit. Nothing here therefore indicates that Ehemann's behavior culminated in the actions condemned by *Faragher* and *Ellerth*.

Finally, in her brief to this court, appellant claims that,

throughout the period Ehemann supervised [appellant], he denied authorization for virtually all of the overtime she worked to complete her assigned duties. This changed as Ehemann began to impose himself sexually on [appellant] and . . . starting at the end of 1998 Ehemann approved virtually all of the overtime [appellant] claimed.

Br. for Appellant at 11 (emphasis omitted); *see also* Trial Tr. at 73 (12/15/03), J.A. 44 (appellant asserting that in the "last half

9

of 1998" she was granted increased access to overtime pay). Both before the District Court and in her appellate brief, however, Ms. Lutkewitte relies on the temporal proximity of her increased overtime pay and her submission to Ehemann in January 1999 to establish that Ehemann conditioned her pay on her acquiescence. Trial Tr. at 59-60 (12/18/03), J.A. 211-12 (arguing that Ms. Lutkewitte demonstrated conditioning based on Ehemann's conveyance of employment benefits "contemporaneously with or very shortly after" Ms. Lutkewitte's sexual acquiescence in January 1999); Br. for Appellant at 29 (same). Because any alleged increased access to overtime pay began before her submission to Ehemann's advances in January 1999, Ms. Lutkewitte failed to offer adequate evidence of causation to warrant a tangible employment action instruction on this claim.

The record thus offers nothing to support appellant's tangible employment action claim. It neither suggests that appellant received benefits that qualify as tangible employment actions, nor otherwise demonstrates that benefits were conditioned on appellant's sexual submission. There is no evidence anywhere in the record to support appellant's assertion that Ehemann implicitly threatened her with a loss of job, demotion, or other tangible employment action if she declined to submit to his advances. Ehemann's harassing conduct was unspeakably offensive and repulsive, but the coercion that is inherent in a supervisor-employee relationship, without more, is not enough upon which to hold an employer strictly liable for a supervisor's sexual harassment. *Ellerth*, 524 U.S. at 760; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986).

Because there is no evidence of a tangible employment action, we agree with the District Court that no reasonable jury could find that appellant's receipt of job benefits was the result of her sexual submission. We find no need, and indeed think it improper, to address larger questions regarding the extent to

which *Faragher* and *Ellerth* are applicable in the "submission" context. The Supreme Court has not addressed whether an employer can be held strictly liable when an employee submits to her supervisor's sexual demands because she reasonably believes that her benefits or continued employment are conditioned upon her acquiescence, although the Second and Ninth Circuits have addressed these issues. *See Holly D.*, 339 F.3d at 1169 (finding that *Faragher* and *Ellerth* apply in the submission context); *Jin*, 310 F.3d at 94 (same). But because all of Ms. Lutkewitte's claims fail based on factors this court has already considered – either on the significance of the employment action taken or on causation – and because the government challenges her claims only on these grounds, we need not decide the novel legal questions raised by Ms. Lutkewitte's requested instructions: whether benefits can constitute tangible employment actions or whether submission in the face of *quid pro quo* harassment itself constitutes a tangible employment action. *See* Br. for Appellee at 20 ("At no time has appellee argued that a tangible employment action has to be adverse or that a threat has to be explicit. Rather, appellee argues that there must be some evidence that the tangible employment action is conditioned upon unwelcomed sexual activity."). This court should decide these important questions only when the facts the plaintiff presents demand their resolution.

The District Court did not issue an opinion in this case and the parties did not squarely address these larger issues in their briefs or in arguments to this court. We therefore believe that it would be a mistake "to address far-reaching questions on which we [might] disagree, when they are wholly unnecessary to the disposition of the case." *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 809-10 (D.C. Cir. 2004) (Roberts, J., concurring). As Justice Frankfurter once put it: "These are perplexing questions. Their difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is

necessary to the disposition of the immediate case." *Whitehouse v. Ill. Cent. R.R. Co.*, 349 U.S. 366, 372-73 (1955).

In sum, we hold that, on the record here, the District Court did not err in declining to give the jury a tangible employment action instruction or in refusing to grant appellant a judgment as a matter of law on her claim of strict liability.

BROWN, *Circuit Judge, concurring in the judgment*: While I concur in the decision to affirm the district court's refusal to give a requested jury instruction, I write separately to suggest a legal—rather than a factual—justification for our judgment. The legal question at the core of this case is a narrow one: whether any of Janet Lutkewitte's allegations, even if accepted as true, qualifies as a "tangible employment action" under the framework established by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Lutkewitte's proposed instruction was consistent with the evidence presented at trial and the legal standard applied by two other circuits; however, that legal theory—while superficially appealing—seems analytically dubious. For the reasons outlined below, I conclude the district court properly refused the instruction.

I

A

At issue here is a difficult subcategory of sexual harassment cases sometimes referred to as submission cases—that is, cases in which the complaining employee submits to the sexual advances of the supervisor. These cases pose unique problems because the employee may have suffered no adverse employment consequences, and hence no economic harm. Lutkewitte argued forcefully that an employer is strictly liable in submission cases for the supervisor's sexual harassment of the employee if a reasonable person in the employee's position would have feared that rejecting the supervisor's advances would have led to retribution. Under her view, an employee's submission or acquiescence in such circumstances constitutes a tangible employment action. *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1167 (9th Cir. 2003) (stating that a tangible employment action occurs when an employee complies with a supervisor's sexual demands in order to avoid a threatened adverse action); *Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 97 (2d Cir. 2002)

(stating that a tangible employment action occurs when a supervisor uses his authority to impose on an employee the added job requirement that she submit to sexual abuse in order to retain her employment). The trial judge initially expressed skepticism in response to this argument, noting that a tangible employment action usually inflicts direct economic harm and requires an official act of the enterprise, documented in official company records and subject to higher level review. Apparently, though, he eventually accepted the basic premise of *Jin* and *Holly D.*, because in denying Lutkewitte's motion for judgment as a matter of law, he did not reject her legal theory. Instead, he found she had presented no evidence that her continued employment was conditioned on providing her supervisor with sexual favors. Lutkewitte then requested a jury instruction that reflected her view of the law, but the judge rejected this proposed instruction, perhaps again finding insufficient evidence, though not elaborating further on his reasoning.

A party is entitled to an instruction on any legal theory that has a basis in the law and the record. *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 556 (D.C. Cir. 1993); *see also Horton v. Buhrke,* 926 F.2d 456, 460 (5th Cir. 1991). The majority finds insufficient evidence that the supervisor made sexual favors a condition of employment, and thus finds the instruction inappropriate on that ground. This approach 1) assumes the validity of the legal theory underlying the proposed instruction and 2) sets the evidentiary bar extremely high. Ordinarily, a victim of sexual harassment need not prove that continued employment or benefits were expressly conditioned or explicitly threatened based on the level of sexual complaisance. As *Holly D.* itself explained: "It is enough that the individual making the unwelcome sexual advance was plaintiff's supervisor, and that a link to employment benefits could [reasonably] be inferred under the circumstances." *Holly D.,* 339

3

F.3d at 1173 (quoting Ming W. Chin et al., Cal. Practice Guide Employment Litig. ¶ 10:51 (2002)) (alteration in original). Therefore, while I agree with the majority that we should not address "far-reaching questions" that are "wholly unnecessary to the disposition of the case," Op. at 10 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 809-10 (D.C. Cir. 2004) (Roberts, J., concurring)), I believe Lutkewitte presented enough evidence to meet this minimal threshold and support an instruction under her theory of the law. Thus, the soundness of Lutkewitte's view of the law must be examined, as the proposed instruction would be justified only if it is *both* legally and factually sufficient.

B

The sequence of events alleged by Lutkewitte is distressing; her account was essentially uncontested at trial and needs to be recounted here only briefly. Lutkewitte is employed as a supervisory computer specialist for the Federal Bureau of Investigation (FBI, or Bureau) and worked at the Bureau's Washington Field Office during the relevant times. From 1996 to 1999, David Ehemann supervised Lutkewitte—first as her second-line supervisor and later as her direct supervisor. Starting in March 1998, Ehemann began making romantic and sexual overtures to Lutkewitte. He asked her out to dinner when they attended out of town conferences, behaved flirtatiously, and told her "don't worry about getting your [promotion to GS-]13, you'll get your 13, and if you stick with me you'll go higher." In January 1999, Ehemann ordered Lutkewitte to assist him during an inspection in New York, where he pressured her into unde-sired sexual intimacies to which she acquiesced because she thought she would lose her job if she told him to stop. After the New York trip, Ehemann's pursuit of Lutkewitte included kissing her hello and goodbye at work, following her, sending her personal e-mails, and rubbing up against her when he thought they were unobserved. She never told him to stop,

because she feared losing her job, but she did try to discourage him and avoid him. Also during this time, an FBI internal investigation concluded that Ehemann "has earned a perception of dealing differently with women in his unit than with men," namely that "women under his command were allowed more privileges and freedoms than men."

Lutkewitte claims—although this point was strongly contested at trial—she first became aware of the Bureau's sexual harassment policies in October 1999. She reported Ehemann's conduct, and the Bureau launched an immediate investigation. Disciplinary measures were recommended, but Ehemann retired before any of those actions (other than his immediate reassignment) was taken. The investigative report acknowledged Ehemann's "conduct had the effect, if not the purpose, of creating an inappropriate work environment" for Lutkewitte, who "was placed in the untenable position of having to rebuff his advances and risk retaliation (although the evidence does not reflect that any had been explicitly threatened by Mr. Ehemann), or to acquiesce to them, to the detriment of her personal well-being."

## II

Lutkewitte brought suit against the FBI, alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964. After a trial, the jury found Lutkewitte had proven she was subjected to a hostile work environment, but also found 1) the FBI took reasonable care to prevent Ehemann's sexually harassing behavior, 2) the FBI exercised reasonable care to promptly correct that behavior, and 3) Lutkewitte unreasonably failed to take advantage of preventive or corrective opportunities, or "unreasonably failed to avoid harm otherwise."

Lutkewitte claims the trial court erred by denying her

request for a jury instruction containing the following language:

> If you find that Ehemann sexually harassed the plaintiff, then you must find the FBI liable for that harassment if you find that any of the following is true:
> 1) Ehemann used his authority as plaintiff's supervisor at the FBI to compel her attendance at an inspection in New York enabling him to take advantage of her; OR
> 2) Ehemann's words or conduct would have communicated to a reasonable person in the [p]laintiff's position that she would suffer negative job consequences if she did not submit to his sexual demands; OR
> 3) Ehemann gave [p]laintiff certain favorable job benefits because she submitted to his sexual demands.

Lutkewitte proffered several examples of "favorable job benefits" she allegedly received during the time in question. She claims that in 1998, Ehemann began allowing her to receive overtime pay in cash rather than in a mix of cash and compensatory time off, as she had previously received. She claims that after March 1998, Ehemann allowed her to use an FBI vehicle as a take-home car, a privilege that she had not been granted before that time, and that this car was upgraded to a new model in 1999. Also in 1999, Ehemann allegedly authorized her to replace the computer she used when working from her home. In addition, Lutkewitte alleges that Ehemann offered to let her "write up" a promotion to a GS-14 position for herself, but she declined to do so. Nevertheless, he increased the staff that reported to her, which was a prerequisite for such a promotion. Lutkewitte's testimony was ambiguous as to the specific dates when some of these changes occurred, but she did state that Ehemann "seemed to allow everything after New York."

Giving a jury an instruction unsupported by *any* evidence is "clearly error," as an "instruction presupposes that there is some

evidence before the jury which they may think sufficient to establish the facts hypothetically assumed in the opinion of the court." *United States v. Breitling*, 61 U.S. (20 How.) 252, 254-55 (1858). Similarly, if a proposed instruction misstates the law, the trial court should not give it to the jury and is not obliged "to tinker with the flawed proposed instruction until it [is] legally acceptable." *Rogers v. Ingersoll-Rand Co.*, 144 F.3d 841, 843 (D.C. Cir. 1998). Based on the evidence presented at trial, a jury could have found that any or all of the three actions described in the proposed instruction did actually occur. Regarding the first prong of the instruction, Lutkewitte claimed Ehemann directly ordered her to join him in New York. Regarding the second prong of the instruction, she testified that she feared losing her job or her benefits if she resisted his advances, and in light of Ehemann's alleged aggressive behavior, a jury could have found Lutkewitte's beliefs to be reasonable.[1] Finally, regarding the third prong of the instruction, she presented evidence that Ehemann granted her various benefits during the period in which she was being harassed and that he had previously promised that she would "go higher" professionally if she stuck with him. While some of the benefits were granted before the ill-fated trip to New York in January 1999, Ehemann's harassment began in March 1998; Lutkewitte had thus already been submitting to his lower-intensity harassment months before the New York incident. The FBI itself concluded that Lutkewitte "was placed in the untenable position" of choosing either to submit to Ehemann's demands or "to rebuff his advances and risk retaliation"; the Bureau's opinions have no legal effect here, but they at least suggest that a jury could reasonably come to the same conclusion.

---

[1] Despite the language of the proposed instruction, the majority does not address the reasonableness of Lutkewitte's fears in light of the overall circumstances, asserting instead that she lacked evidence of "condition[ing]." Op. at 6.

Hence, Lutkewitte's proposed instruction did have a basis in the record, *Joy*, 999 F.2d at 556, which a jury could think sufficient to establish the facts suggested by the instruction, *Breitling*, 61 U.S. (20 How.) at 254-55. It is not this court's role to decide whether a jury ought to have believed Lutkewitte's version of events; no further discussion of the factual record is required. This conclusion, however, leaves unanswered the question of whether Lutkewitte's proposed instruction misstated the law. *See Rogers*, 144 F.3d at 843. If the events alleged by Lutkewitte do not satisfy the legal standard for tangible employment actions under *Faragher* and *Ellerth*, then the district court properly refused to give the proposed instruction.

## III

Title VII of the Civil Rights Act of 1964 states that:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1). The term "employer" is defined to include agents of the employer. *Id.* § 2000e(b). In 1986, the Supreme Court endorsed guidelines previously issued by the Equal Employment Opportunity Commission (EEOC) in which "sexual harassment" was declared to be a form of sex discrimination prohibited by Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). The Court distinguished between cases where sexually harassing conduct was "directly linked to the grant or denial of an economic *quid pro quo*" and those cases where the conduct created a "hostile environment" without such an economic linkage. *Id.* While both types of cases

were declared to be actionable, the conduct in hostile environment claims "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67 (alteration in original) (citation omitted). However, the Court concluded that employers are not "always automatically liable for sexual harassment by their supervisors," although "absence of notice to an employer does not necessarily insulate that employer from liability." *Id.* at 72. While not providing specific rules for an employer's vicarious liability, the Court did state that "Congress wanted courts to look to agency principles for guidance in this area." *Id.*

In the years after *Meritor*, the Courts of Appeals—including this court—developed a rule that *quid pro quo* harassment by a supervisor would result in strict liability for the employer. *See Gary v. Long*, 59 F.3d 1391, 1395-96 (D.C. Cir. 1995). We held that for *quid pro quo* liability to be imposed on the employer, "the supervisor must have wielded the authority entrusted to him to subject the victim to adverse job consequences as a result of her refusal to submit to unwelcome sexual advances." *Id.* at 1396. "To hold otherwise would be to impose liability on the employer without evidence that the supervisor had acted as its agent"; therefore, we concluded that if the supervisor's "threats were not carried out," a plaintiff could not "make out a claim of *quid pro quo* sexual harassment." *Id.* On the other hand, "a supervisor's mere threat or promise of job-related harm or benefits in exchange for sexual favors . . . may create or contribute to a hostile work environment." *Id.* Under traditional agency principles, an employer would not be liable for such conduct if it was outside the scope of the supervisor's employment, but one exception to this rule was that an employer could be liable if the agent "was aided in accomplishing the tort by the existence of the agency relation." *Id.* at 1397 (emphasis and citation omitted). In a sense, the existence of the agency relationship always aids the supervisor's harassment, because

"his responsibilities provide proximity to, and regular contact with, the victim." *Id.* We stated that an employer could avoid liability for hostile work environment claims if it was "able to establish that it had adopted policies and implemented measures such that the victimized employee either knew or should have known that the employer did not tolerate such conduct and that she could report it to the employer without fear of adverse consequences." *Id.* at 1398.

In 1998, however, the Supreme Court provided a new framework for analyzing vicarious employer liability in sexual harassment cases. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). Citing *Gary*, the Court endorsed vicarious liability for the employer when the supervisor is aided in accomplishing the harassment by the existence of the agency relationship. *Ellerth*, 524 U.S. at 760. However, the Court recognized a tension between this principle and *Meritor*'s holding that an employer is not always automatically liable for harassment by its supervisors: "[I]f the 'aid' may be the unspoken suggestion of retaliation by misuse of supervisory authority, the risk of automatic liability is high." *Faragher*, 524 U.S. at 804. To effectuate the limitation of liability recognized in *Meritor*, the court considered "two basic alternatives, one being to require proof of some affirmative invocation of that authority by the harassing supervisor, the other to recognize an affirmative defense to liability in some circumstances, even when a supervisor had created the actionable environment." *Id.* Fearing that the first option would lead to too many judgment calls and difficult issues of proof, the Court chose to establish an affirmative defense that could protect employers from liability. *Id.* at 805. Thus, the Court held:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by

a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* at 807; *Ellerth*, 524 U.S. at 765.

"No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765. "[W]hen a supervisor takes a tangible employment action against the subordinate," then "beyond question, more than the mere existence of the employment relation aids in commission of the harassment." *Ellerth*, 524 U.S. at 760. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761. In such situations, the Court explained, "there is assurance the injury could not have been inflicted absent the agency relation," and in most cases, "direct economic harm" is inflicted on the employee. *Id.* at 761-62. "As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury," as "[t]angible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Id.* at 762. Moreover, "[a] tangible employment decision requires an official act of the

enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* "For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. . . . In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability. . . ." *Id.* at 762-63.

The Court also clarified the proper use of the terms "*quid pro quo*" and "hostile work environment." "[I]n the wake of *Meritor*, [the terms] acquired their own significance," because courts acted as if the "standard of employer responsibility turned on which type of harassment occurred." *Id.* at 752-53. *Ellerth* clarified, however, that those terms are only relevant "when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII." *Id.* at 753. "The terms . . . are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this they are of limited utility." *Id.* at 751. In other words, "[t]he principle significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive." *Id.* at 752. In a *quid pro quo* case, where the "plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, . . . the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Id*. at 753-54. In hostile work environment cases—including cases where a supervisor's threats are unfulfilled—the plaintiff must show "severe or pervasive conduct" for the harassment to be actionable under Title VII. *Id.* at 754. Once actionable sexual harassment of either type has been shown, however, the old labels are no longer useful: the new affirmative defense framework, "and not the categories *quid pro quo* and hostile work environment,

will be controlling on the issue of vicarious liability." *Id.*

The facts of *Ellerth* are also informative. The plaintiff in *Ellerth* was subjected to verbal sexual harassment, and her supervisor threatened that he "could make [her] life very hard or very easy" at the company, depending on whether she "loosen[ed] up." *Id.* at 748 (internal quotation marks omitted). Ellerth alleged that her supervisor's comments amounted to threats to her tangible job benefits, although the threats went unfulfilled (because Ellerth eventually resigned). *Id.* at 747-48. The Supreme Court stated that "Ellerth ha[d] not alleged she suffered a tangible employment action" at the hands of her supervisor and remanded the case for the district court to determine whether the employer could establish the affirmative defense. *Id.* at 766.

IV

Despite the Supreme Court's attempt in *Faragher* and *Ellerth* to establish a framework that would clarify and unify sexual harassment law, much uncertainty remains regarding the definition of a "tangible employment action," a phrase used only once before those decisions.[2] One question still unanswered after those pathmarking cases is whether a tangible employment action must be "adverse." Many of the examples given in *Ellerth*'s definition of the phrase are adverse actions: "firing" and "failing to promote," *id.* at 761, and "discharge, demotion, or undesirable reassignment," *id.* at 765. Others, however, are more ambiguous: "hiring," "reassignment with significantly different responsibilities," and "a decision causing a significant

---

[2] Before June 26, 1998 (the date on which *Faragher* and *Ellerth* were decided), only one opinion, an unreported district court decision, used the precise term. *See Henriquez v. Times Herald Record*, No. 97 Civ. 6176, 1997 WL 732444, at *6 (S.D.N.Y. Nov. 25, 1997).

change in benefits." *Id.* at 761. The Court also stated that "in most cases" a tangible employment action would "inflict[] direct economic harm" (as opposed to other types of harm), and emphasized that only a superior "can cause this sort of *injury*." *Id.* at 762 (emphasis added). The Court stated that the supervisor is always aided by the agency relationship when he "takes a tangible employment action *against* a subordinate." *Id.* at 762-63 (emphasis added). When the Court stated that it would "import" the concept of a tangible employment action from lower court decisions (albeit "[w]ithout endorsing the specific results of those decisions"), it cited opinions that used terms such as "materially adverse change" and "materially adverse employment action" drawn from other areas of antidiscrimination law. *Id.* at 761.

We have since stated that "in defining 'tangible employment action,' the Court could hardly have been more clear that it is not 'the fact of the official action,' . . . but its effect upon the plaintiff that matters." *Roebuck v. Washington*, 408 F.3d 790, 793 (D.C. Cir. 2005). To qualify as a tangible employment action, an official act must have a "significant effect" on the plaintiff's employment status, work, or benefits. *Id.* As the plaintiff in *Roebuck* refused her supervisor's advances, *id.* at 791-92, we did not confront the question of how the *Faragher/Ellerth* standard would apply in submission cases. However, we compared the term "tangible employment action" to another concept present in Title VII case law, that of a "materially adverse action."[3] *Id.* at 794 & n.*. Although we did not decide that the two concepts were identical—stating that we had "no reason in this case to doubt" that they were—we did

---

[3] *Roebuck* refers to the term "materially adverse action," though assorted variants of the phrase have been used in the Title VII context. *See, e.g.*, *Brown v. Brody*, 199 F.3d 446, 452-53 (D.C. Cir. 1999) (using "adverse employment action" and "adverse personnel action").

draw on the analogy for the proposition that a sexual harassment plaintiff must allege that the tangible employment action has made her somehow "worse off." *Id.* We stated that an employee's lateral transfer could qualify as a tangible employment action if it "entailed 'materially adverse consequences affecting the terms, conditions, or privileges of her employment.'" *Id.* (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).

Similarly, our cases have frequently referred to the "tangible employment action" concept in the context of discussing adverse employment actions. *See, e.g.*, *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *Brown*, 199 F.3d at 456-57. We have even announced that "'reassignment with significantly different responsibilities, or . . . a significant change in benefits' generally indicates an *adverse* action." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (alteration in original) (emphasis added) (quoting *Ellerth*, 524 U.S. at 761). However, we have never chosen to establish a firm rule regarding the relationship between the two concepts. Our sister circuits have taken a wide variety of approaches. Some courts have found that the two concepts are not identical. *See, e.g.*, *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031-33 (10th Cir. 2004); *Ray v. Henderson*, 217 F.3d 1234, 1242 n.5 (9th Cir. 2000). Others have treated them, explicitly or implicitly, as interchangeable. *See, e.g.*, *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 n.5 (6th Cir. 2000). At least one has chosen, as we thus far have, not to resolve the issue. *See Watts v. Kroger Co.*, 170 F.3d 505, 510 n.4 (5th Cir. 1999).[4]

---

[4] In subsequent unpublished cases, however, the Fifth Circuit appears to have merged the two concepts. *See, e.g.*, *Donaldson v. Burlington Indus.*, No. 03-51362, 2004 WL 1933603, at *2 (5th Cir. Aug. 31, 2004) (stating that "to succeed on a quid pro quo Title VII

15

In light of this case law, particularly *Ellerth* and *Roebuck,* a convincing case can be made that a tangible employment action must be adverse. Although two other circuits have explicitly adopted an opposite view—in cases I shall address below—the degree to which the concept is intertwined with the emphasis on "adverse" actions elsewhere in Title VII jurisprudence strongly suggests this conclusion.[5] We are obliged to follow the Supreme Court's determinations on this issue, but where its guidance is less than clear, we should tread carefully. The Supreme Court and lower courts frequently treat tangible employment actions and adverse employment actions as being closely related, if not interchangeable. Thus, caution dictates that a definition of tangible employment action should include an element of adversity. *See Newton v. Cadwell Labs.*, 156 F.3d 880, 883 (8th Cir. 1998) (stating that "the absence of a detrimental employment action allows [the employer] to present an affirmative defense" in a sexual harassment suit). This conclusion means only that the employer is not *strictly* liable for a supervisor's harassing conduct in a case involving the exchange of sexual favors for employment benefits. The employer can therefore attempt to defend itself by showing it had reasonable measures in place to prevent such harassment but the employee

---

sexual harassment claim, a plaintiff must show that she suffered an adverse 'tangible employment action'") (footnote omitted).

[5] In addition to the Second and Ninth Circuit cases discussed below, the Fourth Circuit has implied that a tangible employment action need not be adverse, although that court has not explicitly confronted the question. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 267-68 (4th Cir. 2001) (stating that "mundane, non-adverse action[s]" are not tangible employment actions, but also suggesting in dicta that this conclusion "does not mean that the affirmative defense is available when supervisors guilty of sexual harassment do bestow benefits in exchange for an employee's silence"); *Brown v. Perry*, 184 F.3d 388, 395 (4th Cir. 1999).

failed to take advantage of those options for avoiding harm.

This approach is at odds with the stance adopted by the EEOC. Yet while guidelines issued by the EEOC "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," they are not binding. *Meritor*, 477 U.S. at 65 (internal quotation marks omitted). The relevant guidelines issued by the EEOC after *Faragher* and *Ellerth* state:

> If a supervisor undertakes or recommends a tangible job action based on a subordinate's response to unwelcome sexual demands, the employer is liable and cannot raise the affirmative defense. The result is the same whether the employee rejects the demands and is subjected to an adverse tangible employment action or submits to the demands and consequently obtains a tangible job benefit. Such harassment previously would have been characterized as "quid pro quo." It would be a perverse result if the employer is foreclosed from raising the affirmative defense if its supervisor denies a tangible job benefit based on an employee's rejection of unwelcome sexual demands, but can raise the defense if its supervisor grants a tangible job benefit based on submission to such demands. The Commission rejects such an analysis. In both those situations the supervisor undertakes a tangible employment action on a discriminatory basis. The Supreme Court stated that there must be a significant *change* in employment status; it did not require that the change be adverse in order to qualify as tangible.

EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors § IV(B), 1999 WL 33305874, at *5 (June 18, 1999) (footnote omitted). Contrary to

the Commission's belief, such a result would not be "perverse."[6] As I discuss below, the unavailability of the affirmative defense in cases where a tangible employment action has taken place is premised largely on the notice (constructive or otherwise) that such an action gives to the employer—notice that the delegated authority is being used to discriminate against an employee.[7] When an employee is given a benefit, even a benefit equal in magnitude to the actions listed in *Ellerth*, the employer has little reason to suspect that the recipient of the benefit has been discriminated *against*, as Title VII prohibits. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discriminate *against* any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .") (emphasis added). Thus, only adverse actions can truly fill the admonitory role for which the Court created the concept of tangible employment actions.

When a benefit is given for discriminatory reasons, other employees may be unhappy about being denied that same benefit (and may therefore be able to file their own complaints),

---

[6] The EEOC relied on a pre-*Faragher/Ellerth* case to support its statement that the affirmative defense is unavailable in submission cases. *Id.* at *5 & n.36 (citing *Nichols v. Frank*, 42 F.3d 503, 512-13 (9th Cir. 1994)). For reasons discussed below, *infra* n.9, this reliance was misplaced.

[7] This reasoning is consistent with the *Meritor* Court's statement that "absence of notice to an employer does not necessarily insulate that employer from liability." 477 U.S. at 72. First, the *Meritor* Court was referring only to actual notice, not the constructive notice imputed to employers when a tangible employment action occurs. Second, the absence of a tangible employment action does not "necessarily insulate" an employer from liability, as the employer will still be liable if it is not able to prove the elements of the affirmative defense.

but the employment action itself has not injured the harassment victim. The victim has been subjected to harassment, and the employer is still potentially liable for the supervisor's actions. The absence of an adverse tangible employment action only means that the employer retains the opportunity to prove the elements of the affirmative defense. This result sensibly allows the jury to determine whether it was the employer's negligence which caused the employee to be victimized and whether any employment benefits flowed from consensual arrangements—paramour preferences—or from true duress.

V

A

Such an approach is consistent with the Supreme Court's use of the adjective "tangible." When non-adverse actions are taken, an employer has less reason to suspect that its authority is being used to perpetrate harassment, and thus these actions are less "tangible." This concern—that an employer should only be strictly liable when it ought to be on notice that the authority it has delegated is potentially being misused—was emphasized by the Court in a post-*Faragher*/*Ellerth* case that shed further light on why an employment action must be "tangible" to prevent an employer from asserting the affirmative defense. In *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), the Court held that a constructive discharge, in which the employee is driven to resign because of harassing conduct, involves both an act of the employee and (possibly) official action:

> But when an official act does not underlie the constructive discharge, the *Ellerth* and *Faragher* analysis, we here hold, calls for extension of the affirmative defense to the employer. As those leading decisions indicate, official directions and declarations are the acts most likely to be brought

home to the employer, the measures over which the employer can exercise greatest control. Absent "an official act of the enterprise," as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force. And as *Ellerth* and *Faragher* further point out, an official act reflected in company records—a demotion or a reduction in compensation, for example—shows "beyond question" that the supervisor has used his managerial or controlling position to the employee's disadvantage. Absent such an official act, the extent to which the supervisor's misconduct has been aided by the agency relation . . . is less certain. That uncertainty . . . justifies affording the employer the chance to establish, through the *Ellerth*/*Faragher* affirmative defense, that it should not be held vicariously liable.

*Id.* at 148-49 (citations omitted). After *Suders*, then, the rationale behind the *Faragher*/*Ellerth* framework is clear: employers may be held vicariously liable for harassment by supervisors, even when the employer did not know about—much less approve of—the harassing behavior. To justify this imposition of liability, the employer is allowed to assert an affirmative defense by showing, *inter alia*, that it acted reasonably to prevent or correct the behavior, despite its imperfect knowledge. When a tangible employment action has occurred, however, the employer has constructive notice that its authority is being used—and potentially misused. If an employee is fired or demoted, for example, the employer still may not know whether harassment motivated the action, but the Court determined that it is fair to place upon the employer a duty to inquire, to take responsibility for the action, and to assure itself that no discrimi-

nation was involved.[8] An employer may choose not to make this investigation, but it does so at its own risk, as it will be held strictly liable for the misuse of its delegated authority in performing tangible employment actions.

Hence, whether an employment action is "tangible" must be determined from the perspective of the employer, as the tangibility—that is, the constructive notice—is what justifies imposing strict liability. If an action is not tangible from the employer's point of view, the employer has no reason to suspect that its authority is at risk of being misused; it has not, in other words, been given a "heads-up" that it should investigate the supervisor's behavior. In a constructive discharge case, such as *Suders*, no tangible employment action takes place when an employee is harassed into quitting. The harassment is certainly tangible from the employee's point of view; if it were not so, she would not resign. Even so, the circumstances do not justify imposing strict liability, as the employer's authority was not used to perform any action that was tangible from the *employer's* point of view. The employer may well be liable for the harassment that led to the resignation, but only if it fails to prove that it acted reasonably to prevent or correct harm and that the employee unreasonably failed to avoid harm. To hold otherwise would undermine the *Faragher/Ellerth* Court's goals in establishing the affirmative defense: avoiding automatic employer liability (consistent with *Meritor*) without the danger of frequent judgment calls and difficult issues of proof. *Faragher*, 524 U.S. at 804-05.

B

---

[8] For example, some employers may require exit interviews when employees leave; others may require demotions to be justified in writing, as well as being consistent with prior evaluations.

Before *Suders* provided this insight, however, two circuits took a view incompatible with the one described above. These circuits not only endorsed the EEOC view that a tangible employment action did not have to be adverse but essentially reversed the perspective from which tangibility is determined. The Second Circuit took its first steps toward this approach in the years before *Faragher* and *Ellerth* laid out the current framework. In *Karibian v. Columbia University*, 14 F.3d 773, 778 (2d Cir. 1994), a submission case similar to the one we address today, that court held that "nothing in the language of Title VII or the EEOC Guidelines . . . support[s] . . . a require-ment" that "evidence of actual, rather than threatened, economic loss" must be presented "in order to state a valid claim of *quid pro quo* sexual harassment." The court reasoned that "evidence of economic *harm* will not be available to support the claim of the employee who *submits* to the supervisor's demands," but "[t]he supervisor's conduct is equally unlawful under Title VII whether the employee submits or not." *Id.* If evidence of harm would be required, "only the employee who successfully resisted the threat of sexual blackmail could state a *quid pro quo* claim"; hence, the court chose not to "read Title VII to punish the victims of sexual harassment who surrender to unwelcome sexual encounters. Such a rule would only encourage harassers to increase their persistence." *Id.* Instead, "[t]he focus should be on the prohibited conduct, not the victim's reaction." *Id.* at 779.

The *Karibian* court's reasoning is incompatible with the current affirmative defense-driven framework. While that court correctly noted that harassing conduct can violate Title VII regardless of the victim's submission or refusal, that insight has no bearing on whether the employer should be allowed to present the affirmative defense. An employer can be held liable for harassing conduct by a supervisor regardless of whether the victim submits or refuses, regardless of whether any official act is taken or not, and regardless of whether any such official

action is adverse or not. In any of those cases, the employer may be vicariously liable, but in some of those situations the employer would be strictly liable, while in others it would have the chance to prove an affirmative defense. *Karibian*'s reasoning is no longer useful because it presupposes that whether a harassment claim is labeled as "hostile work environment" or "*quid pro quo*" determines whether an employer is strictly liable. *Faragher* and *Ellerth* made clear that those categorical labels no longer justify vicarious liability by themselves; the labels are only useful during the court's initial determination of whether the plaintiff has stated an actionable claim of supervisory harassment: "Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment"—either *quid pro quo* or hostile work environment claims, under the old framework—but allegations of "the latter must be severe or pervasive" to state an actionable harassment claim. *Ellerth*, 524 U.S. at 752. Regardless of the nature of the underlying claim of harassment, strict liability under the new analytical regime is only imputed when the supervisor's harassment culminates in a tangible employment action taken against the victim; that is, the affirmative defense is unavailable only when the employer's authority has been used in such a way as to give constructive notice that harassment (of either variety) has occurred. Thus, alleging *quid pro quo* harassment is no longer the standard for strict liability to attach. While the situation that concerned the *Karibian* court—harassment followed by submission—is still problematic, and still actionable, it arguably should be analyzed differently under the *Faragher*/*Ellerth* framework in order to determine how the affirmative defense applies.

Yet, in *Jin v. Metropolitan Life Insurance Co.*, 310 F.3d 84, 95 (2d Cir. 2002), the Second Circuit preserved the *Karibian* reasoning even after *Faragher* and *Ellerth* had restructured sexual harassment law. In *Jin*, the plaintiff presented evidence

that she submitted to her supervisor's sexual demands after he "explicitly threatened to fire her if she did not submit, and then allowed her to keep her job after she submitted." *Id.* at 94. The court found that a tangible employment action occurred when the supervisor, Morabito, "used his authority to impose on [Jin] the added job requirement that she submit to weekly sexual abuse in order to retain her employment." *Id.* According to the court, agency principles supported this finding, as the supervisor's "empowerment by MetLife as an agent who could make economic decisions affecting employees under his control . . . enabled him to force Jin to submit to his weekly sexual abuse." *Id.* The court decided that "[d]espite the differences in terminology [after *Faragher* and *Ellerth*], *Karibian*'s essential holding that an employer is liable in a *submission* case is sound even under the Supreme Court's new liability analysis."[9] *Id.* at 96. The *Karibian* analysis was shoehorned into the new framework by the proclamation that "[w]hen a supervisor 'make[s] deci-

---

[9] The *Jin* court argued:

> [T]he Court in *Faragher* supported this conclusion by noting the "soundness of the results" in and the "continuing vitality" of cases such as *Nichols v. Frank*, 42 F.3d 503 (9th Cir. 1994) (holding employer vicariously liable where victim submitted to supervisor's requests for oral sex out of fear that she would lose her job if she refused).

*Jin*, 310 F.3d at 96 n.7 (quoting *Faragher*, 524 U.S. at 791). However, *Jin*'s invocation of *Faragher* is inapposite. The *Faragher* Court was only discussing the situations in which vicarious liability for supervisor harassment had been imputed to employers—not the circumstances when the new affirmative defense would be unavailable. The *Faragher* Court had not even established the affirmative defense at this point in its analysis; it thus quite clearly did not cite *Nichols* as an example of a situation where an employer could not assert the defense.

sions affecting the terms and conditions of [plaintiff's] employment based upon her submission to his sexual advances,' he uses his authority to effect, as the definition [of tangible employment action] states, 'a significant change in employment status.'" *Id.* (first three alterations in original) (citations omitted). Although the employer argued that, as in *Ellerth*, no tangible employment action occurred because the supervisor's threats were never carried out, the court distinguished *Ellerth* on the basis that "Ellerth, unlike Jin, was able to resist her supervisor's advances." *Id.* Jin, on the other hand, "was required to submit to sexual acts and . . . Morabito used that submission as a basis for granting her a job benefit (her continued employment)." *Id.* at 97. The court found this situation to be "substantially different from the type of unfulfilled threat alleged in *Ellerth*, where no job benefit was granted or denied based on the plaintiff's acceptance or rejection of her supervisor's advances." *Id.*[10] The court continued:

> [W]hen a victim is coerced into submitting to a supervisor's sexual mistreatment, the threatened detrimental economic tangible employment action may not take place. But that does not mean that the use of the submission as the basis for other job decisions does not also constitute tangible employment action. Because *Faragher* and *Ellerth* support our earlier holding in *Karibian* that economic harm is not required to hold an employer liable in a submission case, we see no persuasive reason to abandon our prior judgment on that issue.

---

[10] I find this assertion to be somewhat inconsistent with the *Jin* court's reasoning. While Ellerth was not explicitly threatened with the loss of her job if she did not submit to sexual demands, she received the same "benefit" for tolerating the harassment that Jin did—she retained her job (until she quit). *Ellerth*, 524 U.S. at 748.

*Id.* at 98 (footnote omitted). The *Jin* court thus failed to recognize the changes prefigured by *Faragher* and *Ellerth*. *Karibian* found that "economic harm" was not necessary to state a claim of *quid pro quo* harassment, 14 F.3d at 778, but although such a claim brought with it strict liability in the old regime, such analysis is now only the first step. Regardless of which label—hostile work environment or *quid pro quo*—would formerly have been used, the plaintiff must now simply show an alteration in the terms of her employment in order to state an actionable claim of sexual harassment. Perhaps *Karibian*'s rule may still be useful this far in the analysis, as it clarifies that the harassment itself need not cause economic harm. The plaintiff, however, must demonstrate more than *quid pro quo* harassment for strict liability to attach: she must show a tangible employment action. This new requirement was not contemplated in the *Karibian* analysis, which dealt only with actionable conduct, not an affirmative defense.[11] Hence, despite the *Jin* court's claim that *Faragher* and *Ellerth* supported the *Karibian* decision, *Karibian* did not truly provide a basis for *Jin*.

The *Jin* court's failure to acknowledge the new role of a tangible employment action becomes clear in its next paragraph:

> Finally, MetLife relies on a statement in *Ellerth* that a "tangible employment decision requires an official act of the enterprise, a company act." But, assuming Jin's allegations to be true, Morabito's use of his supervisory authority to require Jin's submission was, for Title VII purposes, the

---

[11] As noted above, a close reading of *Faragher* and *Ellerth* supports the view that a tangible employment action must be not only tangible but also adverse. *Karibian* is consistent with this rule when properly viewed as addressing only whether a claim of *quid pro quo* harassment has been stated—a determination with far fewer consequences than it used to have.

act of the employer. This is because Morabito brought "the official power of the enterprise to bear" on Jin by explictly threatening to fire her if she did not submit and then allowing her to retain her job based on her submission. And though a tangible employment action "in *most* cases is documented in official company records, and *may* be subject to review by higher level supervisors," the Supreme Court did not require such conditions in all cases. Indeed, it would be difficult to imagine either documentation or higher level review in a submission case.

*Jin*, 310 F.3d at 98 (citations omitted). By so holding, the Second Circuit removed the requirement of tangibility from the definition of a tangible employment action. As *Suders* later clarified, a tangible employment action is an act "likely to be brought home to the employer" in the sense that the employer is on notice that its authority is being exercised and is thus placed under a duty to ensure that the act is nothing but "the typical kind daily occurring in the work force," rather than the culmination of harassment. 542 U.S. at 148. In *Jin*, the supervisor did not commit any act that should have given his employer notice that he was using (and therefore potentially abusing) the power delegated to him. If the supervisor had actually used his authority, rather than only threatened to use it, the company could have been expected to ensure that the authority had not been misused. Based on the alleged facts, however, no basis existed for holding the company strictly liable for the supervisor's conduct. Of course, upon a showing of such severe harassment, the company would be presumptively liable under *Faragher* and *Ellerth*, but in the absence of an act that was tangible from its own point of view, the company should have been given a chance to prove that it had not been negligent and that the plaintiff had been.

The Ninth Circuit has followed the Second Circuit's approach. *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158 (9th

Cir. 2003). In *Holly D.*, the plaintiff claimed that her supervisor implicitly threatened to fire her if she did not submit to his sexual demands. *Id.* at 1163-64. The court held that when "in order to avoid the threatened action, the employee complies with the supervisor's demands," a tangible employment action occurs. *Id.* at 1167.[12]

> In such cases, unlike in *Ellerth*, the threat does not simply remain unfulfilled or inchoate, but rather results in a concrete consequence. The supervisor accomplishes the objective of the threat—the coercion of the sexual act—by bringing to bear the authority to make critical employment determinations on behalf of his employer.

*Id.* at 1168-69. "Thus, the participation in unwanted sexual acts becomes a condition of the employee's employment—a critical condition that effects a substantial change in the terms of that employment." *Id.* at 1169. While this reasoning is logical, the *Holly D.* court misunderstood its significance. As *Faragher* and *Ellerth* made clear, "Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment [but] the latter must be severe or pervasive" to qualify as a valid claim. *Ellerth*, 524 U.S. at 752. Thus, when "participation in unwanted sexual acts becomes a condition of the employee's employment," *Holly D.*, 339 F.3d at 1169, Title VII is violated. Yet this violation itself only suggests that the employer *may be* liable—under *Faragher* and *Ellerth*, the employer's opportunity to avoid strict liability and assert the affirmative defense depends on another issue, the presence of a tangible employment action. The Ninth Circuit, however, conflated the two steps: "The employer may be held vicariously liable for the

---

[12] Though agreeing with the plaintiff's legal theory, the court also found that Holly D. had not presented sufficient evidence in support of her allegations to avoid summary judgment. *Id.* at 1176.

supervisor's unlawful conduct and may not take advantage of the *Faragher/Ellerth* defense." *Id.* While the first half of that sentence is accurate, the second half is not a necessary corollary.

The Ninth Circuit's reasoning fails for the same reason as does the Second Circuit's: it relies on a pre-*Faragher/Ellerth* case that allowed a claim of *quid pro quo* harassment, with the then-attendant strict liability, "when the employee's continued employment was conditioned on her participation in sexual acts." *Id.* (citing *Nichols v. Frank*, 42 F.3d 503, 513-14 (9th Cir. 1994)). The *Holly D.* court implied that *Faragher* and *Ellerth* endorsed the reasoning in *Nichols*, although as noted above, *supra* n.9, the *Faragher* Court did nothing more than note the "continuing validity" of *Nichols* and other cases' holdings that employers *could* be liable in certain situations. *See Faragher*, 524 U.S. at 791. At that point in the *Faragher* decision, the Court had only examined the bases for employer liability; it had not yet formulated the affirmative defense, let alone specified when it would or would not be available. In other words, *Nichols*'s continued validity only pertains to potential employer liability, not strict liability. This distinction necessarily follows from the reduced role played by the *quid pro quo* label after *Faragher* and *Ellerth*: while affixing that label led to strict liability in *Nichols*, it now only serves to demonstrate that an actionable claim of harassment has been stated.

While the Ninth Circuit acknowledged that a plaintiff must demonstrate a tangible employment action in order for strict liability to attach, it eviscerated the "tangibility" requirement in the same way as did the Second Circuit. The court stated that "when the supervisor actually coerces sex by abusing the employer's authority, and thus makes concrete the condition of employment he has imposed," his harassment "culminates in a 'tangible employment action.'" *Holly D.*, 339 F.3d at 1170. Similarly, the court opined that the "injury" in "[submission]

cases—the physical and emotional damage resulting from performance of unwanted sexual acts as a condition of employment—is as tangible as an injury can be." *Id.* at 1171. Regardless of the accuracy of the court's injury assessment, its use of the word "tangible" underscores its fundamental mistake: it analyzes tangibility from the employee's perspective. While this choice is necessary in assessing the victim's injury, the Ninth Circuit analyzed the tangibility of employment actions from the same point of view, contrary to the *Faragher/Ellerth* rationale clarified in *Suders*. Accordingly, the Ninth Circuit found that a tangible employment action occurs "when a supervisor determines that the retention of an employee in the employer's employ will depend on her participation in sexual acts, and then . . . retains her in her position because she does" participate. *Id.* Although some may prefer a rule holding an employer strictly liable for such egregious misconduct, that rule would not comport with the *Faragher/Ellerth* justifications for imputing liability. For the current framework to be internally consistent, tangibility should be determined from the employer's perspective. If a supervisor threatens an employee, and she submits in order to avoid adverse consequences, the supervisor has not committed an "official act" but merely threatened to do so. The employer has no way of knowing that its delegated authority has been brandished in such a way as to coerce sexual submission. While it may still be liable in such a situation, *Faragher* and *Ellerth* dictate that it be given the opportunity to defend its conduct and demonstrate that any negligence was committed by the employee.

Another problematic aspect of the Second and Ninth Circuits' approach to tangibility is that under their standard, tangibility depends on the employee's actions, not the supervisor's. If a supervisor threatens an employee with adverse consequences unless she submits to his sexual demands, and the employee resists, no tangible employment action occurs.

However, the employee's reaction can apparently change the nature of the supervisor's action: if she changes her mind and submits, the logic of *Jin* and *Holly D.* would suddenly demand that the supervisor's action be considered tangible, even though the action itself has not been altered. Such a result would be nonsensical; the only aspect of the situation that becomes more tangible is the psychological injury to the employee, not the supervisor's action for which the employer is to be held liable.

Not only is this result illogical, it may also be at odds with the policies considered by the Supreme Court in formulating the *Faragher/Ellerth* framework. Allowing tangibility—and thus the imposition of strict liability—to hinge on the employee's reaction rather than on the supervisor's action itself "undermines the avoidable consequences doctrine which the Supreme Court incorporated into this area of law." *Speaks v. City of Lakeland*, 315 F. Supp. 2d 1217, 1226 (M.D. Fla. 2004) (citing *Ellerth*, 524 U.S. at 764). "The Supreme Court's stated goal in *Faragher/Ellerth* was to balance agency principles of vicarious liability with Title VII's basic policy of encouraging employers to promulgate and enforce anti-discrimination/harassment policies and encouraging employees to avoid the harm caused by harassment and discrimination by . . . reporting such misconduct quickly." *Id.* While an employee's response to harassment cannot retroactively transform a threat into a tangible employment action, her reaction is still important to the effectiveness of Title VII. In order for our sexual harassment law to deter and redress misconduct, victims must report harassing behavior as promptly as possible. To find that a tangible employment action was created by an employee's acting contrary to this policy—submitting to the conduct rather than exposing it—does not conform to the Supreme Court's stated policy goals, let alone the legal framework the Court formulated. The law is a limited tool, and it cannot right every wrong. Empowering employees to report unlawful behavior is far preferable to allowing abusive

31

situations to spiral out of control and attempting to patch up the damage afterwards.

For all these reasons, I would therefore explicitly reject Lutkewitte's reliance on *Jin* and *Holly D.* in support of her contention that a tangible employment action occurred so long as Ehemann used his supervisory authority to coerce her into submitting to his sexual advances. She argues that a reasonable woman in her position would have believed that her job or benefits would be in jeopardy if she did not submit. Hence, by submitting, Lutkewitte ensured that the status quo—her continued employment with the FBI—would be maintained. While this argument may be relevant to determining whether Lutkewitte has stated a claim for sexual harassment, it has no relevance under existing Supreme Court precedent in answering whether a tangible employment action occurred and whether the affirmative defense should therefore be permitted. Threats of future adverse actions (whether explicit or implicit) may culminate in a tangible employment action if carried out, but they do not themselves meet that standard. Ehemann's alleged threats do not become tangible merely because Lutkewitte feared for her benefits or because the FBI recognized that Ehemann had an ongoing problem with favoring women he supervised.[13] Nor does Ehemann's purported acceleration or augmentation of Lutkewitte's benefits—the use of a new computer and a new car, receipt of overtime compensation in cash rather than a mix of cash and time off, and enhanced supervisory authority—constitute a tangible employment action.

---

[13] The FBI's knowledge of Ehemann's general reputation for treating female employees differently cannot act as a substitute for a tangible employment action. Even if the FBI knew that Ehemann sometimes acted inappropriately, that knowledge is not equivalent to knowledge (actual or constructive) of specific misuse of delegated authority.

The provision of those benefits is not adverse, nor is it tangible, as none of the benefits is as "significant" as "hiring, firing, [or] failing to promote."[14] *Ellerth*, 524 U.S. at 761. In the absence of adverse actions on the record that would place the FBI on constructive notice of Ehemann's actions, no tangible employment action occurred, and the FBI should not be deprived of the opportunity to present its affirmative defense.

## VI

Finally, Lutkewitte argues that a tangible employment action occurred when Ehemann used his supervisory authority to require her to join him in New York. She argues that this exercise of his authority placed her in a position where he was better able to assault her. In support of this position, Lutkewitte cites *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995). In *Tomka*, the Second Circuit found that an employer could be held liable for harassment by supervisors if the employee could prove at trial that those supervisors used their authority to compel her to attend a meeting, after which she was allegedly raped repeatedly while intoxicated. *Id.* at 1307. However, while *Tomka* may be useful in analyzing whether an employee has stated a cognizable claim of harassment, it sheds no light on *Faragher* and *Ellerth*'s creation of the affirmative defense framework several years later. Ehemann's summoning of Lutkewitte to New York did not have a "significant effect" on Lutkewitte's employment status, *Roebuck*, 408 F.3d at 793; a short business trip is not a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

---

[14] While a promotion to GS-14 clearly would have qualified as "tangible" (though it still would not have been adverse), Lutkewitte did not receive that promotion, and her increased supervisory responsibilities were at most a prelude to a promotion, not themselves comparable in scope to a promotion.

different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. While the *Ellerth* list of tangible employment actions is not exhaustive, an action must be of comparable significance in order to qualify. Lutkewitte's travel to New York does not qualify as "significant" in this narrow sense, nor was it—on its own—adverse, notwithstanding the alleged subsequent assaults.

In sum, while Lutkewitte's proposed jury instruction was supported by the evidence she presented at trial, the instruction itself was legally flawed. None of Lutkewitte's alleged tangible employment actions merits that title under existing Supreme Court precedent. The district court therefore properly decided not to give Lutkewitte's requested instruction, or any tangible employment action instruction, to the jury. I believe these legal principles, rather than an assertion of the paucity of the record, provide a stronger justification for our decision and a rationale to guide future cases.